# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

TERRI ENBORG, et al.

        Plaintiff,

v.

ETHICON, INC., et al.,

        Defendants.

CASE NO.  2:20-cv-02477-AWI-BAK

**ORDER ON:**

**(1) DEFENDANTS' MOTIONS TO EXCLUDE EXPERT OPINIONS AND TESTIMONY;**

**(2) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**

(Doc. Nos. 103, 104, 105, 106, 111 & 112)

## <u>INTRODUCTION</u>

This case began as part of MDL No. 2327, *In re Pelvic Repair Systems Products Liability Litigation,* Case No. 2:13-cv-18734 (S.D. W. Va.), before the Honorable Joseph R. Goodwin in the Southern District of West Virginia (the "MDL Court"), as one of thousands of cases involving injuries patients allegedly suffered after undergoing implant procedures using pelvic mesh products designed, manufactured, and sold by Johnson & Johnson subsidiaries Ethicon, Inc. and Ethicon, LLC. Terri Enborg and her former spouse, Christopher Enborg, (together, "Plaintiffs") filed a Short Form Complaint that incorporates the First Amended Master Complaint in MDL No. 2327 on July 10, 2013, setting forth claims against Johnson & Johnson, Ethicon, Inc. and Ethicon, LLC in connection with a TVT device implanted by Dr. Andrew Walter in October 2008. Doc.

1 No. 1 at 2-4. On October 7, 2019, the MDL Court dismissed Ethicon, LLC from this action with

2 prejudice pursuant to a joint motion brought by the parties under Rule 41(a)(1)(A)(ii) of the

3 Federal Rules of Civil Procedure, leaving Johnson & Johnson and Ethicon, Inc. (together,

4 "Defendants" or "Ethicon") as the sole defendants. Doc. No. 34. The case was remanded to this

5 Court on December 15, 2020. Doc. No. 67.

6   The MDL Court initially followed the traditional bellwether process but later began to

7 utilize a "wave" process to work up cases filed in the MDL, in which a "wave" was a group of

8 cases designated for pretrial discovery and motion practice on the same timeline. Doc. No. 86 at 4.

9 This action was a member of Wave 12. Id.

10   In proceedings before the MDL Court, the Parties filed motions challenging certain

11 opinions of designated experts under Rule 702 of the Federal Rules of Evidence and *Daubert v.*

12 *Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Doc. No. 86 at 4. The MDL Court instructed

13 the parties to file only one *Daubert* motion per challenged general expert and to file each motion

14 in the main MDL, as opposed to the individual member cases. Id.

15   Ethicon filed motions to exclude with respect to the following experts designated to

16 provide general opinions in this case about the TVT device used in Ms. Enborg's implant

17 procedure: Bruce Rosenzweig, Scott Guelcher, Vladimir Iakovlev and Peggy Pence. Doc. No. 86

18 at 4:13-16. Ms. Enborg[1] filed motions to exclude the following experts designated by Ethicon to

19 provide general opinions in this case: Bruce Kahn, Teri Longacre, Steven MacLean, Olga Ramm,

20 Edward Stanford, and Timothy Ulatowski. Id. at 4:16-18.

21   In Waves 1 – 7 of the MDL, the MDL Court entered orders addressing the Parties' general

22 *Daubert* motions. Doc. No. 86 at 4:19-20. Often, the orders issued in Waves 2–7 adopted relevant

23 portions of Judge Goodwin's Wave 1 order, while reserving arguments not addressed by Judge

24 Goodwin's Wave 1 order for the trial court. Id. at 4:20-22.

25   As stated above, this action was a member of Wave 12. At the time of transfer to this

26 Court, Judge Goodwin had not adopted in Wave 12 cases any of the orders he issued in prior

27 _____

28 [1] It does not appear that Mr. Enborg brought any motions to exclude Ethicon's experts, either individually or with Ms. Enborg.

waves and consequently, such orders have not been entered in this case. Doc. No. 86 at 4:27-5:1. Nonetheless, the Parties acknowledge the applicability of orders issued by the MDL Court to *Daubert* motions in this action. Id. at 5:1-2.

Pursuant to the scheduling order issued by this Court on October 14, 2021, the parties filed *Daubert* motions in this action that were limited to issues raised but not resolved in the MDL Court. Doc. No. 100 at 2:13-14; see also Doc. No. 95 at 2:9-14 (joint status report recommending that the parties file "*Daubert* motions limited to the challenges raised, but not resolved, in the MDL Court").

This order addresses Ethicon's motion to exclude certain opinions and testimony by Plaintiffs' experts. This order also addresses Ethicon's motion for summary judgment, as filed in this Court on November 29, 2021. Doc. No. 112. The Court will issue a separate order addressing motions brought by Ms. Enborg to exclude certain opinions and testimony by Ethicon's experts.

## ETHICON'S *DAUBERT* MOTIONS

The Court has a duty to act as a "gatekeeper" for expert testimony by assessing its admissibility. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 145, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); Fed.R.Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.").

This inquiry is governed in part by Rule 702 of the Federal Rules of Evidence, which pertains to "Testimony by Expert Witnesses" and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. At bottom, a court must ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth the following, non-exhaustive factors for reviewing the reliability of an expert opinion:

> (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community.

509 U.S. at 593–94. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and "a trial court may exclude evidence when it finds that there is simply too great an analytical gap between the data and the opinion proffered." Domingo ex rel. Domingo v. T.K., 289 F.3d 600, 607 (9th Cir. 2002) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)) (internal quotation marks omitted).

This portion of the Court's opinion addresses Ethicon's *Daubert* motions with respect to: Peggy Pence, Ph.D. (Doc. No. 103), Scott Guelcher, Ph.D. (Doc. No. 104), Vladimir Iakovlev, M.D. (Doc. No. 105), Bruce Rosenzweig, M.D. (Doc. No. 106) and Donald R. Ostergard, M.D. (as to whom Ethicon also brings a motion to strike) (Doc. No. 111).

## I.   Dr. Peggy Pence

Plaintiffs proffer Dr. Pence as a regulatory expert. Ethicon seeks to exclude Dr. Pence's opinions that: (i) Ethicon failed to conduct appropriate testing of the TVT device used in treating Ms. Enborg ("Opinion #1"); (ii) the TVT device was misbranded due to failure to warn ("Opinion #2"); (iii) the TVT device was misbranded as a result of false or misleading labeling ("Opinion #3"); and (iv) the TVT device was misbranded under federal law because of failure to meet the post-marketing vigilance standard of care ("Opinion #4").[2] Doc. No. 103 at 2:9-20.

As set forth below, the Court will grant summary judgment in Ethicon's favor on claims arising from warnings and alleged misrepresentations involving the TVT, based on the Court's finding under California's learned intermediary doctrine that a reasonable jury could not conclude

---

[2] The Court applies to Dr. Pence's opinions the numeric labels ("Opinion #1," "Opinion #2," etc.) used by Dr. Pence in her TVT report, which appear to differ from the numbers assigned to each of Dr. Pence's opinions in Ethicon's motion. See Doc. No. 103-3 at 116-17.

that additional information from Ethicon regarding TVT risks would have affected the treatment

prescribed and implemented by Ms. Enborg's implanting physician. In fact, only Ms. Enborg's

negligent design defect and Mr. Enborg's derivative loss of consortium claim survive summary

judgment. Ms. Enborg does not show (or attempt to show) how Opinion #2, Opinion #3 or

Opinion #4 applies to her negligent design defect claim so the Court will exclude all three

opinions for lack of relevance. See Fed.R.Evid. 402; see also, Foster v. Ethicon, Inc., 2021 WL

4476642, at *8–10 (D.S.D. Sept. 30, 2021) (excluding Dr. Pence's opinions that "the TVT was

misbranded because of Ethicon's failure to warn, failure to meet the post-market vigilance

standard of care, and use of false and misleading labels" because plaintiff's "failure-to-warn claim

did not survive summary judgment").

     That leaves Dr. Pence's opinion that Ethicon failed to conduct adequate testing for the

TVT ("Opinion #1," as numbered in Dr. Pence's TVT Report).

     Judge Goodwin excluded that opinion in a 2014 bellwether case, finding that Dr. Pence

failed to "explain the bases for her opinion that Ethicon's testing was inadequate." In re Ethicon,

Inc., Pelvic Repair Sys. Prod. Liab. Litig. (Lewis v. Ethicon), 2014 WL 186872, at *18 (S.D. W.

Va. Jan. 15, 2014) (Judge Goodwin finding that Dr. Pence "simply notes that the tests were not

done" and "points to nothing requiring such testing"). Dr. Pence has since issued a supplemental

expert report identifying the Global Harmonization Task Force ("GHTF") guidelines as the

applicable industry standards and explaining how these guidelines "establish additional foundation

for [her] opinions." Doc. No. 103-3 at 299. She also discusses sources addressing the need for

more clinical studies of vaginal mesh implants, including, for example, a 2006 study by the French

National Authority for Health ("HAS") evaluating the safety and effectiveness of vaginally

implanted mesh for treating genital prolapse. Id. at 300.

     Other courts have found that the sources cited in Dr. Pence's supplemental report provide a

sufficiently reliable basis for her opinions regarding testing and that any defects in her data,

analysis or findings are properly addressed through cross-examination at trial. See, e.g.,

Foster, 2021 WL 4476642 at *8–10; Sanchez v. Bos. Sci. Corp., 2014 WL 4851989, at *33–34

(S.D.W. Va. Sept. 29, 2014) (Judge Goodwin finding Dr. Pence's supplemented opinion was

1  "backed by authoritative studies that recommend the performance of clinical trials and long-term

2  follow-ups before using polypropylene mesh"). The Court agrees with the reasoning in such cases

3  and will therefore deny Ethicon's motion to exclude as to Dr. Pence's Opinion #1.

4  **II.    <u>Dr. Scott Guelcher</u>**

5        Scott Guelcher holds a Ph.D. in chemical engineering and completed post-doctoral training

6  in biomedical engineering. Plaintiffs retained Dr. Guelcher to provide opinions regarding the

7  defective design of the TVT device at issue in this case. The MDL Court issued orders relating to

8  some aspects of Dr. Guelcher's testimony but did not resolve Ethicon's challenges to Dr.

9  Guelcher's safer alternative design opinions or Ethicon's challenges to the reliability of Dr.

10  Guelcher's degradation opinions. The Court addresses each of those issues here.

11        **A.    Safer Alternative Design Opinions**

12        With respect to alternative designs, Dr. Guelcher opines: "Using autologous fascia lata,

13  allograft, sutures (including polypropylene sutures), or polyvinylidene fluoride (PVDF) mesh does

14  not present with the same chronic complications associated with the material properties of

15  Ethicon's PP mesh." Doc. No. 104-3 at 4. Ethicon argues that "many of Guelcher's alternative

16  design opinions are irrelevant because they are alternative ***treatment options***—not feasible, safer

17  alternative ***designs*** to Ethicon's TVT." Doc. No. 104-1 at 3:10-12 (emphasis original).

18        It is not clear from Ethicon's memoranda exactly which of Dr. Guelcher's opinions

19  Ethicon is seeking to exclude when it states "*many* of Guelcher's alternative design opinions are

20  irrelevant." Doc. No. 104-1 at 3:10-11 (emphasis added). In *Salinero v. Johnson & Johnson*, the

21  court distinguished between Dr. Guelcher's opinions regarding autologous fascia lata and

22  allografts as "two categories of biologic grafts, or surgical procedures using natural tissue," on the

23  one hand, and Dr. Guelcher's opinions regarding PVDF as a synthetic polymer, on the other. 2019

24  WL 7753453, at *17 (S.D. Fla. Sept. 5, 2019). Further, the Court notes that Ethicon acknowledges

25  PVDF as a "mesh alternative," Doc. No. 104-1 at 4:9, and it appears that sutures, as referenced in

26  Dr. Guelcher's report, are properly characterized as a procedural alternative to Ethicon's mesh, as

27  opposed to an alternative device. <u>See</u> Doc. No. 104-3 at 23 ("In addition, Ethicon employees and

28  consultants, both before and after the TVT was launched, have noted that heavy-weight meshes

like the TVT comprise significantly more polypropylene than sutures or light-weight meshes, and therefore the foreign body reaction and resulting changes on the surface of the TVT device will be much greater than that for a lightweight mesh or a non-load bearing suture.").

Numerous courts have agreed with Ethicon that opinions regarding "alternative procedures/surgeries" are properly excluded because they "do not inform the issue of whether an alternative design for a product exists." See In re: Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig., 2017 WL 1264620, at *3 (S.D.W. Va. Mar. 29, 2017); see also Wood v. Am. Med. Sys. Inc., 2021 WL 1178547, at *5 (D. Colo. Mar. 26, 2021) ("Evidence about a wholly different procedure, like the allograft testimony of Dr. Guelcher, however, merely establishes the existence of that procedure, not that the medical device at issue here was defective."); Willet v. Johnson & Johnson, 465 F. Supp. 3d 895, 907-08 (S.D. Iowa 2020) (agreeing "with the MDL court that, as a general matter, 'alternative procedures/surgeries do not inform the issue of whether an alternative design for a product exists' " and  excluding "opinions about native tissue repair, allografts, and xenografts as safer alternative designs" on that basis); Salinero, 2019 WL 7753453 at *17 (excluding Dr. Guelcher's "safer alternative design" opinions as to allografts in part on a finding that "surgical procedures such as biologic grafts are not actually 'alternative designs' to synthetic pelvic mesh products" (emphasis original)).

In *Mullins v. Johnson & Johnson*, 236 F. Supp. 3d 940 (S.D.W. Va. 2017), for example, the MDL Court found that "[e]vidence that a surgical procedure should have been used in place of a device is not an alternative, feasible design in relation to the TVT" and reasoned that "[w]hether an alternative procedure could have been performed without the use of the TVT does nothing to inform the jury on the issue of an alternative, feasible *design* for the TVT." Id. at 943 (emphasis original). Similarly, the MDL Court found that "other surgeries or procedures do not inform the jury on how the TVT's design could have feasibly been made safer to eliminate the risks that caused the plaintiffs' injuries." Id. at 944.

Ms. Enborg contends that Dr. Guelcher's opinions should be admitted under *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413 (1978), where the California Supreme Court held that the "mechanical feasibility of a safer alternative design" is among the relevant factors a jury may consider in

assessing the "adequacy of a product's design," Doc. No. 121 at 4:15-5:3, and similarly argues that, in determining whether a defendant used reasonable care, California Civil Jury Instructions ("CACI") 1221 calls for balancing the "potential harm from [a] product against the burden of taking safety measures to reduce or avoid the harm." Doc. No. 121 at 5:4-9. *Barker*, however, makes no reference to using the availability of alternative procedures to assess the adequacy of a product design, see Barker, 20 Cal. 3d at 431 (stating that under California law, "the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design" are relevant to the design defect inquiry). And the negligence inquiry in CACI 1221 "asks if the manufacturer failed to use the amount of care in designing the product that a reasonably careful designer or manufacturer would have used in similar circumstances." Howard v. Omni Hotels Management Corp., 203 Cal. App. 4th 403, 430 (2012). The Court does not see (and Ms. Enborg does not explain) how the availability of alternative procedures that do not make use of the device at issue bears, in any way, on that inquiry.

The Court will therefore exclude Dr. Guelcher's opinions as to autologous fascia lata, allograft and sutures.

Further, the Court agrees with the finding in *Salinero* that since Dr. Guelcher is not a clinician, he is not in a position to observe and assess patient outcomes and that, consequently, his opinions as to patient complications are unreliable. 2019 WL 7753453, at *17; cf. Boneta v. Am. Med. Sys., Inc., 2021 WL 6134790, at *5 (S.D. Fla. Sept. 27, 2021) ("Dr. Guelcher is a biomedical and chemical engineer, not a medical practitioner. His technical expertise in biomedical engineering and chemistry does not qualify him to opine on potential clinical complications that may result from polypropylene mesh degradation inside a patient's body.").

Therefore, in addition to barring Dr. Guelcher's testimony regarding autologous fascia lata, allograft and sutures, the Court will exclude testimony on Dr. Guelcher's part addressing patient complications from Ethicon's mesh or PVDF mesh.

**B.    Degradation Opinions**

Ethicon argues that Dr. Guelcher's opinion that chemicals in the human body cause

Prolene to oxidize and degrade over time is unreliable because the paper on which it is based (sometimes referred to as the "Talley study") merely repackages testing that the MDL Court found unreliable due, *inter alia*, to a lack of a written protocol and an insufficient sample size. Doc. No. 104-1 at 5.

*Salinero* is the only case the Court is aware of in which a court found that Dr. Guelcher's opinions were unreliable to the extent they were based on the Talley study. Other courts have found that the disposition in *Salinero* had more to do with the "the parties' litigation positions in that case, than the objective reliability of the Talley Study," <u>Wood</u>, 2021 WL 1178547 at *4, and it appears that a majority of courts are of the view that arguments such as those raised by Ethicon here are "fodder for cross-examination" but do not render Dr. Guelcher's degradation opinions unreliable under *Daubert*. <u>See id.</u>; <u>see also</u> <u>White v. Ethicon, Inc.</u>, 2022 WL 538760, at *6 (W.D. Wash. Feb. 23, 2022) (finding that the Talley study was peer-reviewed and published in a reliable scientific journal and that arguments regarding Dr. Guelcher's degradation testimony was "better suited for cross-examination"); <u>McBroom v. Ethicon, Inc.</u>, 2021 WL 2709292, at *22 (D. Ariz. July 1, 2021) ("Defendants likely have identified flaws in the Talley study, but those flaws are fodder for cross-examination." (internal quotation marks and alteration omitted)); <u>Gomez v. American Medical Sys., Inc.</u>, 2021 WL 1163087, *13 (D. Az. Mar. 26, 2021) ("Drs. Guelcher and Mays seek to use [the Talley] study to support their opinion that polypropylene mesh, generally, degrades *in vivo*. The details of the study go to weight, not admissibility of the opinions.").

The Court agrees with these courts that the issues identified by Ethicon do not "fundamentally undermine the Talley study," <u>Wood</u>, 2021 WL 1178547 at *4, and for that matter, that Ethicon's arguments for excluding Dr. Guelcher's degradation testimony do not take adequate account of the other authority on which Dr. Guelcher's degradation opinions are based. <u>See Roeder v. Am. Med. Sys., Inc.</u>, 2021 WL 4819443, at *3–4 (D. Kan. Oct. 15, 2021). The Court will therefore deny Ethicon's motion as to Dr. Guelcher's degradation opinions.

## III.   Dr. Vladimir Iakovlev

### A.   Degradation Opinions

Ethicon argues that Dr. Iakovlev's opinion that polypropylene, including Ethicon's

Prolene, degrades in the human body and can cause adverse clinical effects—sometimes referred to as his "bark theory"—should be excluded because his "theory and his underlying methodology are contrary to the FDA's guidance, not generally accepted in the scientific community, have not been subject to valid testing, and are not supported by published scientific literature." Doc. No. 105-1 at 4:2-5. Ethicon further argues that Dr. Iakovlev's other degradation opinions depend on the observations underlying his "bark" theory and should therefore also be excluded. Id. at 105-1 at 4:1-2.

Other courts have addressed these arguments and found, based on analysis the Court finds persuasive, that Dr. Iakovlev's "bark theory" is not based on sound methodology (due largely to a lack of adequate testing), but that Dr. Iakovlev's other degradation opinions are admissible in that they are supported by other sources. See, e.g, Cutter v. Ethicon, Inc., 2020 WL 2060342, at *6 (E.D. Ky. Apr. 29, 2020) (excluding Dr. Iakovlev's bark degradation testimony to the extent it is based on his "bark theory"); Salinero, 2019 WL 7753453 at *8-10 (similar); Kaiser v. Johnson & Johnson, 2018 WL 739871, at *3 (N.D. Ind. Feb. 7, 2018) (allowing Dr. Iakovlev "to testify to his degradation opinions generally" but finding "no evidence … to demonstrate that Dr. Iakovlev's 'degradation bark theory' [wa]s the product of reliable principles and methods").

The Court will therefore grant Ethicon's motion to exclude as to Dr. Iakovlev's "bark theory" of degradation but deny the motion as to Dr. Iakovlev's other degradation opinions.

## B.   Warnings Opinions

Ethicon argues that, as a pathologist, Dr. Iakovlev is not qualified to offer opinions as to warnings for Ethicon's mesh products. Doc. No. 105-1 at 12:17-22. Ms. Enborg states that she does not intend to offer Dr. Iakovlev's warning opinions. Moreover, the Court has found that Ethicon is entitled to summary judgment on the warning and misrepresentation claims. Doc. No. 119 at 12:7-8. The Court will therefore grant Ethicon's motion to exclude as to Dr. Iakovlev's warnings opinions on the grounds that they are irrelevant. See Fed.R.Evid. 402.

## IV.   Dr. Bruce Rosenzweig

Dr. Rosenzweig is a pelvic surgeon and urogynecologist who was designated to provide general causation opinions about Ethicon's TVT device. Ethicon argues that Dr. Rosenzweig

should be precluded from: (i) testifying that non-synthetic mesh procedures are a safer alternative to TVT; (ii) criticizing the cut of the TVT mesh; and (iii) testifying about the polypropylene resin Material Safety Data Sheet ("MSDS"). See Doc. No. 106-1.

### A.    Safer Alternative Devices

Dr. Rosenzweig opines that "[t]here were reasonably feasible safer alternatives" to the TVT, including the Burch procedure, autologous fascia slings and allograft slings. Doc. No. 106-3 at 94. Ethicon argues that this testimony should be excluded because the Burch procedure is a surgery, not a medical device, and unlike the TVT device, the autologous slings and allograft slings make use of biological tissue, not synthetic polypropylene. Doc. No. 106-1 at 3:3-14.

The Court agrees with Ethicon for the reasons set forth above in the discussion of Dr. Guelcher's opinions regarding safer alternatives. At bottom, Dr. Rosenzweig's proposed alternatives "are not proposed modifications or improvements of [TVT] itself." See Meindertsma v. Ethicon, Inc., 2021 WL 2010355, at *3 (W.D. Tex. May 17, 2021). The Court will therefore grant Ethicon's motion as to Dr. Rosenzweig's opinion that the non-synthetic mesh procedures identified in his report are safer alternatives to the TVT device. See White, 2022 WL 538760 at *3 (barring Dr. Rosenzweig from testifying in support of plaintiff's design defect claim that non-synthetic mesh procedures are a safer alternative to Ethicon's TVT-Exact device).

### B.    Cut of TVT Mesh

Dr. Rosenzweig opines that "Ethicon knew that the old construction mechanically cut mesh (Prolene) was not appropriate for use in its TVT device but has failed to modify/change the mechanically cut mesh to a larger pore, lighter weight mesh that would not deform, fray, lose particles, rope, curl, degrade, cause excessive foreign body reactions, and cause excessive shrinkage/contraction." Doc. No. 106-3 at 4. Further, he opines that laser cut mesh is "inappropriate for [u]se as a permanent implant because it is too stiff and rigid and causes pain and erosion and urinary dysfunction as a result." Id.

The mesh in Ms. Enborg's TVT was mechanically cut. Ethicon argues that Dr. Rosenzweig should be precluded from criticizing the method used to cut Ms. Enborg's mesh because "neither Plaintiff's case-specific expert, Dr. Donald Ostergard, or anyone else has opined that Ms. Enborg

1  sustained any injury as a consequence of the way that the mesh was cut." Doc. No. 106-1 at 5:17-

2  24. Further, Ethicon argues that Dr. Rosenzweig opines that TVT mesh is defective regardless of

3  how it was cut, and none of Plaintiffs' experts asserts that a TVT with a different cut would be a

4  safer design. Id. Ms. Enborg argues in opposition that Dr. Rosenzweig's opinions are reliable; that

5  his opinions as to the different risks associated with laser-cut mesh and mechanically-cut mesh are

6  not contradictory; and any inconsistencies in the testimony at issue are "a basis for cross-

7  examination, not a basis for exclusion." See Doc. No. 120.

8          The Court agrees with Ethicon that Ms. Enborg's opposition goes solely to the reliability

9  of Dr. Rosenzweig's testimony (which Ethicon does not attack) and does not address the relevance

10  of Dr. Rosenzweig's testimony regarding the characteristics of mechanically cut mesh and laser

11  cut mesh. Further, the Court agrees with Ethicon that Ms. Enborg has failed to establish the

12  relevance of such testimony in that Dr. Ostergard, as Ms. Enborg's case-specific expert, does not

13  posit a causal relationship between Ms. Enborg's injuries and the method used to cut her mesh and

14  Dr. Rosenzweig does not assert that laser cut mesh is a safer alternative to the mechanically cut

15  mesh in Ms. Enborg's device. Indeed, Dr. Rosenzweig calls for changes to the composition of the

16  mesh, not a change in the method used to cut it. See Doc. No. 120-3 at 4 (Dr. Rosenzweig stating

17  that Ethicon "failed to modify/change the mechanically cut mesh to a larger pore, lighter weight

18  mesh that would not deform, fray, lose particles, rope, curl, degrade, cause excessive foreign body

19  reactions, and cause excessive shrinkage/contraction"). Finally, even if there were some relevance

20  to this evidence, the probative value is substantially outweighed, in the Court's view, by the

21  danger of unfair prejudice, confusion, and waste of time, in that it is likely to be misconstrued as

22  causation or safer alternative testimony. See Fed.R.Evid. 403.

23          Dr. Rosenzweig will therefore be precluded from criticizing the method used to cut the

24  mesh in Ms. Enborg's TVT device.

25          **C.    Polypropylene Resin MSDS Sheet**

26          In pages 61-63 of his report, Dr. Rosenzweig opines that the Prolene mesh in the TVT is

27  "not suitable for permanent implant because the Material Safety Data Sheets ("MSDS") for

28  polypropylene resin used to manufacture polypropylene states that polypropylene is incompatible

with strong oxidizers such as peroxides which are readily found in the vagina." Doc. No. 106-3 at 61-63. Further, Ethicon construes Dr. Rosenzweig's report as opining that the warnings and disclosures of adverse events in materials relating to the TVT device were inadequate because they did not include information contained in the MSDS for polypropylene resin. See Doc. No. 106-1 at 6:14-15. Ethicon argues that Dr. Rosenzweig should not be permitted to testify to either issue. Id. at 6:14-7:3.

As stated above, the Court will grant summary judgment in Ethicon's favor on Ms. Enborg's warnings and misrepresentation claims. Any opinions as to the adequacy of information in materials relating to the TVT will therefore be excluded for lack of relevance. See Fed.R.Evid. 402.

Otherwise, it appears that a majority of the courts that have considered the issue "has found Dr. Rosenzweig qualified to opine on the MSDS and information contained therein." White, 2022 WL 538760 at *4. The Court agrees with the reasoning and findings in such cases and thus, Ethicon's motion will be denied to the extent Ethicon seeks to bar Dr. Rosenzweig from using the MSDS to support his opinions regarding oxidation and use of mesh in the vagina. See, e.g., In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig., 2020 WL 774234, at *4 (S.D. W. Va. Feb. 13, 2020) ("The MSDS need not expressly forbid implantation in humans for Dr. Rosenzweig to use its statements about strong oxidizers—which he explains are readily found in the vagina—to support his concerns about mesh use in the vagina."); Humleker v. Bos. Sci. Corp., 2020 WL 6870852, at *11 (M.D. Fla. Oct. 2, 2020) ("Dr. Rosenzweig, an experienced urogynecologist, need not be an expert in biocompatibility testing or industry standards in order to use statements in the MSDS to support his concerns about mesh use in the vagina.").

**V.    Dr. Donald Ostergard**

 **A.    Motion to Strike Supplemental Report**

The deadline for expert disclosure in this case was August 19, 2019. On August 19, 2019, Plaintiffs disclosed Dr. Ostergard as a specific causation expert on Ms. Enborg's alleged injuries and served Ethicon with a copy of Dr. Ostergard's expert report. Approximately two months later, on October 14, 2019, Plaintiffs served Ethicon with a supplemental expert report for Dr. Ostergard

13

containing, most pertinently, opinions regarding Ms. Enborg's dyspareunia that were not set forth in the August 19, 2019 report.

Ethicon argues that the Court should strike Dr. Ostergard's supplemental report because it was served after the expert disclosure deadline and contains new opinions that could have been contained in Dr. Ostergard's initial report. Ms. Enborg argues that the opinions set forth in the supplemental report are based on "medical records that were collected after the date of his initial report" and that Dr. Ostergard was not aware of certain facts relating to Ms. Enborg's dyspareunia until after Ms. Enborg was deposed. Doc. No. 117 at 4:6-12. Further, Ms. Enborg argues that the supplemental report was served prior to the October 25, 2019 close of discovery and that Ethicon cannot claim prejudice because it did not request a continuance of Dr. Ostergard's deposition or a second deposition with respect to the new opinions in the supplemental report. Id. at 4:13-5:2.

The Court agrees with the court in *Mullins v. Ethicon, Inc.* that Rule 26(e) of the Federal Rules of Civil Procedure—which addresses supplements to expert reports— "is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy" and that "[t]o construe [Rule 26(e)] supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation." 2017 WL 455938, at *5 (S.D. W. Va. Feb. 2, 2017) (quoting Cochran v. Brinkmann Corp., 2009 WL 4823858, at *5 (N.D. Ga. Dec. 9, 2009) and Campbell v. United States, 470 Fed. Appx. 153, 157 (4th Cir. 2012), respectively) (internal quotation marks omitted).

Dr. Ostergard acknowledged at his deposition that he had access to Ms. Enborg and her medical history prior to August 19, 2019 and that the supplemental report was necessary solely because he "neglected" to fully address Ms. Enborg's dyspareunia in the original report. Doc. No. at 50 (Deposition of Donald R. Ostergard, M.D. ("Ostergard Dep.") at 18:7-25, 21:16-25 ("Q. Can you tell me in a summary fashion, did any of your conclusions change in your supplemental report based upon the review of additional information? A. Well, this would be reflected starting in paragraph 61. *And the only thing I did was I had neglected to put information about her dyspareunia, so I added that into this report,* which is paragraph 66. And so there really have been

no changes in my opinions, based upon producing a revised report." (emphasis added)). Further, Ms. Enborg makes no showing that the information set forth in her deposition or the additional medical records referenced in the supplemental report were not available to Dr. Ostergard prior to August 19, 2019. See Doc. No. 117 at 4:9-12 (stating without elaboration that "[i]t was [Ms. Enborg's] deposition testimony that allowed Dr. Ostergard to know that the dyspareunia [Ms. Enborg] suffered post-implant was related to the mesh" and that Dr. Ostergard reviewed medical records "that were *collected* after the date of his initial report" (emphasis added)).

At bottom, it appears Dr. Ostergard unilaterally granted himself a two-month extension on the deadline for expert disclosure in this case with no valid justification for doing so. The Court will therefore strike Dr. Ostergard's supplemental report, as served on Ethicon on October 14, 2019.

**B.    General Causation Opinions.**

Ethicon seeks to bar Dr. Ostergard from offering general opinions regarding potential TVT complications on the grounds that Dr. Ostergard was disclosed only as a specific causation expert and not as a general causation expert. Doc. No. 111-1 at 4. The opinions at issue include the following:

- TVT can cause vaginal mucosal dehiscence, chronic pelvic and lower abdominal pain, pain from nerve entrapment, urinary frequency, recurrent urinary tract infections, painful intercourse, and vaginal rigidity – the treatment of which is "to remove the device";

- TVT can cause allergic reactions resulting in need to remove the mesh;

- "Generally [TVT removal] is very difficult due to the intense inflammatory reaction and the resultant fibrosis and scarring of the tissues . . . [which] is especially prominent with the TVT mesh device";

- "Complete removal generally is not possible due to the degradation of the polypropylene which weakens the mesh to the point that it literally falls apart during dissection";

- "Removal attempts may also damage the nearby organs";

- Multiple surgeries "are frequently required in attempts to remove the device";

- "Patients also experience contracture and shrinkage . . . which makes intercourse

painful and sometimes impossible"; and

- TVT can lead to "pelvic pain syndrome which is very difficult to treat and narcotics may be required to control the pain."

Id. at 5:1-18. Further, Defendants argue that if Dr. Ostergard is permitted to opine on general issues, he should not be permitted to provide opinions involving complications—such as vaginal mucosal dehiscence, allergic reactions and damage to nearby organs from removal procedures— that Ms. Enborg is not alleged to have experienced and that Dr. Ostergard does not attribute to Ms. Enborg in his specific causation opinions. Id. at 6:6-8.

Ms. Enborg states that she "does not intend to elicit testimony from Dr. Ostergard about complications not at issue here" but argues that Dr. Ostergard should be permitted to testify (based on his knowledge, experience and review of Plaintiff's records) to complications (including infections, abscesses and certain types of pain) that Plaintiff is at risk of experiencing while mesh remains in her body. Doc. No. 117 at 5:5-8.

To the extent Ethicon's motion to exclude pertains to general causation and complications that Ms. Enborg has not experienced and that Dr. Ostergard does not foresee for Ms. Enborg, the motion is unopposed and largely consistent with orders issued by the MDL Court. See, e.g., In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig., 2016 WL 7242550, at *2 (S.D. W. Va. Dec. 14, 2016) (noting plaintiff's failure to disclose the witness as a general causation expert and concluding that his expert testimony must therefore be limited "to only his specific causation opinions"); Frankum v. Boston Scientific Corp., 2015 WL 1976952, at *4, *7 (S.D. W. Va. May 1, 2015) (excluding general opinions offered by witness disclosed as a specific causation expert).

Dr. Ostergard will therefore be barred from offering general causation opinions or opinions regarding conditions that he does not foresee Ms. Enborg experiencing. The extent to which Dr. Ostergard can otherwise offer opinions as to conditions Ms. Enborg has not experienced will be addressed below.

## C. Design Defect Opinions

Dr. Ostergard, opines as follows:

The ETHICON TVT sling device is flawed and should never have been inserted into Ms. Enborg. As I have discussed in previous expert reports and depositions,

16

the ETHICON TVT sling is made from polypropylene and the mesh is heavy weight, with small pores, impure, not inert, degrades, shrinks, causes chronic inflammation, dense fibrosis and potentiates infection. As a result of the presence of this device in her body, she has suffered injuries and will continue to suffer from them.

Doc. No. 111-3 at 17-18.

Defendants argue that this amounts to nothing more than an opinion that Ms. Enborg's symptoms were due to the presence of the TVT in her body and is insufficient to satisfy the applicable causation requirement under California law because it does not link Ms. Enborg's symptoms to defects in the device. In other words, Defendants argue that "Dr. Ostergard's presence-of-TVT-opinion [ ] does not explain any specific or particular defects which led to Ms. Enborg's specific injuries." Doc. No. 139 at 14:10-15.

The Ninth Circuit has held, however, that "[g]iven the difficulties in establishing a medical cause and effect relationship, '[c]ausation can be proved even when we don't know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow.' " Kennedy v. Collagen Corp., 161 F.3d 1226, 1230 (9th Cir.1998) (quoting Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1314 (9th Cir. 1995)). In that vein, the Ninth Circuit has further held that an expert can satisfy the causation requirement in product liability cases by ruling out other causes of a patient's symptoms through a process of elimination known as a "differential diagnosis." Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1058 (9th Cir. 2003); Messick v. Novartis Pharms. Corp., 747 F.3d 1193, 1198–99 (9th Cir. 2014). That is what Dr. Ostergard purports to have done here. See Doc. No. 42-3. For example, Dr. Ostergard attributes Ms. Enborg's "urinary bladder outlet obstruction" to "mesh shrinkage" and the "intense inflammatory and dense fibrotic reaction of the ETHICON TVT mesh," after ruling out potential alternative causes such as bladder stones and diabetes on the grounds that such conditions were "not present." Doc. No. 42-3 at 17. In the Court's view, a jury could construe agents resulting in the *in vivo* transmogrification and inflammation as defects and find, based on the absence of a viable alternative explanation, that they were the cause of Ms. Enborg's urinary blockage, even absent a showing as to "precisely how" they caused the blockage. A similar line of reasoning could be applied to other conditions Ms. Enborg has allegedly experienced.

That is not to say that Dr. Ostergard's "differential diagnosis" is beyond reproach as to all—or any—of Ms. Enborg's conditions. The first step in the differential diagnosis process is "to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." Clausen, 339 F.3d at 1057–58 (internal citations omitted). "The second step is for the expert to engage in a process of eliminating or ruling out the identified potential causes." Id. at 1058; Stanley v. Novartis Pharms. Corp., 11 F. Supp. 3d 987, 1000–01 (C.D. Cal. 2014). In doing so, the "expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." Clausen, 339 F.3d at 1058.

Dr. Ostergard provides little explanation as to how he excluded other potential causes of Ms. Enborg's symptoms, and many of his determinations strike the Court as conclusory, unclear and unconvincing. Dr. Ostergard admits, for example, that he did not examine—or even speak to—Ms. Enborg prior to preparing his opinions. See Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999) (stating that a "reliable differential diagnosis typically, though not invariably, is performed after 'physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests'…."). And, as noted above, he admits that he lacked information relating to Ms. Enborg's dyspareunia prior to her deposition.

At bottom, however, Dr. Ostergard has proffered relevant testimony putatively based on a relevant data set and a methodology that the Ninth Circuit has deemed reliable. Defendants have not shown (or attempted to show) that Dr. Ostergard did not, in fact, perform differential diagnosis and, thus, whatever defects there may be in Dr. Ostergard's work go to the weight of his testimony and become fodder for cross-examination. A reasonable jury could conclude from Dr. Ostergard's differential diagnosis that one or more of Ms. Enborg's conditions was more likely than not caused by TVT defects, see Messick, 747 F.3d at 1198–99 ("[a] doctor using a differential diagnosis grounded in significant clinical experience and examination of medical records and literature can certainly aid the trier of fact …."), and thus Ethicon's motion to exclude will be denied as to Dr. Ostergard's design defect opinions as they pertain to Ms. Enborg's conditions.

1      **D.      Potential Future Complications**

2      Ethicon argues that there is no basis for Dr. Ostergard's opinion that Ms. Enborg may

3 experience additional mesh-complications such as infections, abscesses, mesh degradation, SIN

4 Syndrome and Central Sensitization in the future because she has not experienced such

5 complications in the nearly 14 years since her mesh was implanted and Dr. Ostergard testified that

6 almost all of Ms. Enborg's mesh has now been removed. Doc. No. 111-1 at 7:16-28. Further,

7 Ethicon argues that, in addition to being speculative, testimony regarding potential complications

8 is irrelevant and that testimony regarding possible cancer, in particular, would be unduly

9 prejudicial. Id. at 9:16-22. Ethicon argues that Dr. Ostergard's testimony regarding future

10 complications is not speculative because it is "based on his knowledge, experience, and review of

11 Plaintiff's records." Doc. No. 117 at 5:14-15.

12      Dr. Ostergard states that the "potential exists" for roughly a dozen adverse events "[s]ince

13 some of the implanted ETHICON TVT pubourethral sling mesh remains in the dense fibrotic

14 tissue produced by the device in Ms. Enborg's body." Doc. No. 111-3 at 20.  Given Dr.

15 Ostergard's clinical experience, the Court would not characterize this as "speculation," but the

16 Court is struck by Dr. Ostergard's failure (as Ms. Enborg's case specific expert) to elaborate on

17 the  probability of the risks he identifies or otherwise to offer a personalized risk profile for Ms.

18 Enborg that reflects, for example, the amount of time that has passed since implantation, the

19 amount of mesh that remains in her body, the complications she has experienced to date or other

20 such factors.

21      At bottom, Dr. Ostergard offers a laundry list of complications that he believes can arise

22 from the TVT mesh without linking items on that list to Ms. Enborg. The Court appreciates the

23 potential probative value of the testimony at issue here but is concerned that it could be

24 outweighed by risk of confusion and prejudice. See Fed.R.Evid. 403. The Court will therefore

25 reserve ruling on this issue, subject to some proffer (outside the presence of the jury) as to Dr.

26 Ostergard's testimony at trial.

27      **E.      Warnings and Informed Consent**

28      As set forth below, the Court will grant summary judgment in Ethicon's favor on Ms.

Enborg's warnings and misrepresentation claims. Dr. Ostergard's opinions regarding informed consent and the adequacy of product warnings will therefore be excluded for lack of relevance. See Fed.R.Evid. 402.

### F.     "Defect" and "Defective"

Ethicon argues that Dr. Ostergard should not be permitted to opine that the TVT mesh is "defective" or that it has "defects" because such testimony draws a legal conclusion and contains a legal term of art. Doc. No. 111-1 at 6-15. Ms. Enborg states that she "does not intend to elicit legal conclusions form Dr. Ostergard" and that Dr. Ostergard can provide "his expert opinions as to what Defendants' mesh has done, has not done, might do, or might not do to Plaintiff … without using the words 'defective' or 'defects.' " Doc. No. 117 at 10:1-5. The Court will therefore preclude Dr. Ostergard from using the term "defect" and its direct variants in his characterization of the mesh, subject to the clarification that this portion of the Court's order does not otherwise limit Dr. Ostergard's testimony as to TVT mesh or its effects on Ms. Enborg. See, e.g., In re: Ethicon, Inc., 2016 WL 4536885, at *4 (S.D.W. Va. Aug. 30, 2016) (barring "inappropriate legal conclusions" in expert testimony); In re C.R. Bard, Inc., 948 F. Supp. 2d 589, 629 (S.D.W. Va. 2013) (barring expert from "draw[ing] legal conclusions from facts").

### VI.   Conclusion Regarding Ethicon's *Daubert* Motions

Ethicon's *Daubert* motions will be granted in part and denied in part as set forth above. The Court will now address Ethicon's motion for summary judgment. Doc. No. 112.

### ETHICON'S MOTION FOR SUMMARY JUDGMENT

As initially plead, the Complaint included the following causes of action:

- Count I - Negligence
- Count II - Strict Liability - Manufacturing Defect
- Count III - Strict Liability - Failure to Warn
- Count IV - Strict Liability - Defective Product
- Count V - Strict Liability - Design Defect
- Count VI - Common Law Fraud
- Count VII - Fraudulent Concealment

- Count VIII - Constructive Fraud
- Count IX - Negligent Misrepresentation
- Count X - Negligent Infliction of Emotional Distress
- Count XI - Breach of Express Warranty
- Count XII - Breach of Implied Warranty
- Count XIII - Violation of Consumer Protection Laws
- Count XIV -Gross Negligence
- Count XV - Unjust Enrichment
- Count XVI- Loss of Consortium
- Count XVII- Punitive Damages
- Count XVIII - Discovery Rule and Tolling

On May 4, 2021, the Court issued an order granting stipulated dismissal with prejudice of Counts II (Strict Liability - Manufacturing Defect), IV (Strict Liability - Defective Product), V (Strict Liability - Design Defect), VI (Common Law Fraud), VII (Fraudulent Concealment), VIII (Constructive Fraud), XI (Breach of Express Warranty), XII (Breach of Implied Warranty), XIII (Violation of Consumer Protection Laws), and XV (Unjust Enrichment). Doc. No. 94. On November 29, 2021, Ethicon filed a motion for summary judgment addressing Plaintiffs' remaining claims. Doc. No. 112. For the reasons set forth below, the motion will be granted in part and denied in part.

## I.   **Legal Framework**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ. P. 56(a); see Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1079–80 (9th Cir. 2004). The moving party bears the burden of establishing the absence of a genuine issue of material fact, generally by "citing to particular parts of materials in the record" such as depositions, interrogatory answers, declarations, and documents. Fed.R.Civ.P. 56(c); see also, Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986)). If

the moving party does not meet this burden, "[s]ummary judgment may be resisted and must be denied on no other grounds than that the movant has failed to meet its burden of demonstrating the absence of triable issues." Henry v. Gill Indus., 983 F.2d 943, 950 (9th Cir. 1993).

If the moving party does meet this burden, the burden then shifts to the opposing party to show a genuine issue of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); see also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, 210 F.3d 1099, 1103 (9th Cir. 2000). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In response to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; see Liberty Lobby, 477 U.S. at 247-48 ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment" (emphasis original)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " Matsushita, 475 U.S. at 587; Liberty Lobby, 477 U.S. at 248 (a "dispute about a material fact is 'genuine' " where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 248 (1986) (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288–89 (1968)) (internal quotation marks omitted). If the nonmoving party does not produce enough evidence to create a genuine issue of material fact after the burden has shifted, the moving party is entitled to summary judgment. Fed.R.Civ.P. 56(c); Fritz, 210 F.3d at 1103; Celotex, 477 U.S. at 322.

**II.    Discussion**

    **A.    Count X (Negligent Infliction of Emotional Distress), Count XIV (Gross Negligence), Count XVII (Punitive Damages) & Count XVIII (Discovery Rule or Tolling)**

Ethicon seeks summary judgment on Counts X, XIV, XVII and XVIII on the grounds that (at least in the context of this case) they do not constitute separate causes of action under California law.

As to Count X, Ethicon asserts that "[w]here, as here, there is a separate claim for negligence seeking damages, negligent infliction of emotional distress is not a separate tort or cause of action, but an element of damages." Doc. No. 112 at 25:14-16. Further, Ethicon contends that to the extent Mr. Enborg claims negligent infliction of emotional distress as a bystander, the claim fails because Mr. Enborg was not able to observe the manufacture of the TVT, which, Ethicon claims, "is the event giving rise to injury." Id. at 25 at 25:16-21. Ms. Enborg[3] acknowledges that emotional distress is an element of damages—and that negligent infliction of emotional distress is not a separate claim—in her case. Doc. No. 136 at 19:18-25. And Mr. Enborg, who did not oppose summary judgment, makes no attempt to show either that he claims negligent infliction of emotional distress or that he has a basis (in the form of observing manufacture of the TVT or otherwise) for such a claim. The Court will therefore grant summary judgment in Ethicon's favor on Count X. See Faustino v. Alcon Laboratories, Inc., 2015 WL 12839161, at *6 (C.D. Cal. Sept. 22, 2015), aff'd sub nom. Faustino v. Alcon Laboratories, Inc. (a division of Novartis AG), 692 Fed. Appx. 819 (9th Cir. 2017) ("it is settled in California that in ordinary negligence actions for physical injury, recovery for emotional distress caused by that injury is available as an item of parasitic damages" (citation omitted)).

As to Count XIV, Ms. Enborg does not dispute Ethicon's contention that gross negligence is a species of ordinary negligence and, thus, not a separate claim under California law. Doc. No. 136 at 19:12-16. Further, she states that she is not pursuing an independent claim for gross negligence. Doc. No. 136 at 5:6-10. The Court will therefore grant summary judgment in Ethicon's favor on Count XIV. See Jimenez v. 24 Hour Fitness USA, Inc., 237 Cal. App. 4th 546, 552 n.3 (2015) ("California does not recognize a distinct common law cause of action for gross negligence apart from negligence.").

---

[3] Mr. Enborg did not file an opposition to Ethicon's motion for summary judgment.

Ethicon argues that it is entitled to summary judgment on Count XVII, labeled "Punitive Damages," because punitive damages are a remedy, not a claim, under California law. Ms. Enborg argues, citing *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011), that the label of the claim is not controlling and that Count XVII is actually a claim (cognizable under California law) for the tort of "wanton and reckless misconduct." Doc. No. 136 at 20:13-26. Ethicon argues in reply that *Rhynes* cannot not be read to mean that a "claim" for punitive damages is "synonymous" with a claim for wanton and reckless misconduct, and that the pertinent difference between this case and *Rhynes* is that, unlike Ms. Enborg, the plaintiff in *Rhynes* actually brought a claim where wanton and reckless misconduct was the theory of liability and not merely the predicate for an enhanced remedy.

Reviewing the First Amended Master Long Form Complaint from MDL 2327, Doc. No. 53-1, the Court notes that Count XVII largely restates allegations set forth in other counts and culminates in the following allegation: "Defendants have engaged in conduct entitling Plaintiffs to an award of punitive damages pursuant [to] Common Law principles and the statutory provisions of the Plaintiffs' respective states." See Doc. No. 53-1 at 57-60. The Court therefore agrees with Ethicon that, consistent with its "Punitive Damages" label, Count XVII merely seeks a punitive damages remedy and does not purport to set forth a theory of liability different from the theories of liability alleged in other counts.

The Court will therefore grant summary judgment in Ethicon's favor on Count XVII, with the clarification that doing so does not preclude Plaintiffs from seeking punitive damages in connection with other counts. See Patrick v. 3D Holdings, LLC, 2014 WL 1094917, at *15 (D. Haw. Mar. 18, 2014) (finding that claims labeled "Willful and Wanton Conduct and/or Reckless Disregard" was "not a cause of action" but recognizing that dismissal of the claim "d[id] not preclude Plaintiff from seeking punitive damages if she [could] otherwise prove willful or wanton conduct in reckless disregard of Plaintiff's rights").

Finally, Ms. Enborg acknowledges that discovery rule/tolling is not a claim under California law and states that she is not pursuing such a claim here. Doc. No. 136 at 5:6-8, 21:2-3. The Court will therefore grant summary judgment in Ethicon's favor on Count XVIII. See

1  *Migliori v. Boeing N. Am., Inc.*, 114 F. Supp. 2d 976, 984 (C.D. Cal. 2000) (explaining the nature

2  of the discovery rule).

3       Factoring in the stipulated dismissals, the foregoing rulings leave the following claims for

4  further analysis: failure to warn and negligent misrepresentation (Counts I, III and IX), negligent

5  design defect (Count I), and loss of consortium (Count XVI).

6       Ethicon argues that all these claims are time-barred; that the failure to warn and negligent

7  misrepresentation claims fail for lack of causation in that Plaintiffs cannot show that additional

8  warnings would have affected the conduct of Ms. Enborg's implanting physician; and that the

9  design defect claim fails because Ms. Enborg's case-specific expert, Dr. Ostergard, fails to link

10  any of Ms. Enborg's conditions to a defect in the TVT. Further, Ethicon argues that it is entitled to

11  summary judgment on the loss of consortium claim, as a derivative claim, because Ms. Enborg's

12  predicate claims fail. The Court addresses each of these arguments below.

13       **B.**    **Statute of Limitations**

14       Ethicon argues that all of Plaintiffs' remaining claims are time-barred because Ms. Enborg

15  suspected or reasonably should have suspected her TVT was linked to her injuries more than two

16  years before this action was filed. Ms. Enborg argues that she was not on notice of her claims until

17  November 2011, when a new doctor finally connected Ms. Enborg's injuries to the TVT mesh.

18       *1.*    *Applicable Law*

19       Under California law, Plaintiffs' claims are subject to the two-year statute of limitations

20  applicable to actions for "injury to . . . an individual caused by the wrongful act or neglect of

21  another." See Cal. Civ. Proc. Code § 335.1; *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797,

22  809 (2005) ("At present, the statute of limitations for an action for injury to an individual caused

23  by the wrongful act or neglect of another must be commenced within two years from the date of

24  accrual.") "Section 335.1 bars untimely personal injury claims upon defective products regardless

25  of the particular legal theory invoked." *Erickson v. Bos. Sci. Corp.*, 846 F. Supp. 2d 1085, 1094

26  (C.D. Cal. 2011) (citing *Soliman v. Phillip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002)).

27       The personal injury statute of limitations typically begins to run when the elements of the

28  claim are complete—that is, when the plaintiff's injury occurs. See, e.g., *Fox*, 35 Cal. 4th at 806.

Under California's discovery rule, however, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her …." Rivas v. Safety-Kleen Corp., 98 Cal. App. 4th 218, 225 (2002) (internal quotation marks and citations omitted). In other words, "the limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry." Id.; see also Rustico v. Intuitive Surgical, Inc., 424 F. Supp. 3d 720 (N.D. Cal. 2019), aff'd, 993 F.3d 1085 (9th Cir. 2021) (a claim accrues at the time of "inquiry notice").

"[K]nowledge of the harm is not required for a claim to accrue." Henderson v. Pfizer, Inc., 285 F. App'x 370, 373 (9th Cir. 2008) (citations omitted). "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights." Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1111 (1988). "So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." Id.

"A plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." Id. (citation omitted) (emphasis original); Czajkowski v. Haskell & White, LLP, 208 Cal. App. 4th 166, 174-75 (2012) (the burden of pleading and establishing "belated discovery" is on the party relying on the discovery rule to toll the limitations period). California's discovery rule "is based on an objective standard that looks not to what the particular plaintiff actually knew but to what a reasonable inquiry would have revealed." Coleman v. Bos. Sci. Corp., 2011 WL 3813173, at *2 (E.D. Cal. Aug. 29, 2011).

   2.   *Relevant Facts*

The evidence relevant to the statute of limitations analysis is as follows:[4]

Dr. Walter implanted Ms. Enborg's TVT sling on October 2, 2008. Doc. No. 139-1 at 2

---

[4] The facts set forth below are drawn primarily from Defendants' Reply to Plaintiff's Response to Defendants' Statement of Undisputed Facts and Response to Plaintiff's Statement of Undisputed Facts, which reflects the parties' responses and objections to putative facts set forth by the other side. Doc. No. 139-1. The Court only credits portions of Defendants' facts that Ms. Enborg admits or as to which Ms. Enborg fails to show a dispute. Ms. Enborg's objections to Defendants' facts are overruled because they do not affect the Court's ruling on the timeliness of Plaintiffs' claims.

(Defendants' Undisputed Fact ("DUF") 1). Ms. Enborg reported pelvic pain to Dr. Walter within 4 weeks of the October 2, 2008 surgery, which pain Dr. Walter attributed to fibromyalgia. Id. at 5 (DUF 6). That was Ms. Enborg's last appointment with Dr. Walter. Id.

From the first time she had sex after surgery, Ms. Enborg experienced dyspareunia that was different from—and more severe than—the dyspareunia she experienced prior to surgery. Doc. No. 139-1 at 6 (DUF 7-8).

On December 9, 2008, Ms. Enborg saw Dr. Larry Bowen for continuing postsurgical treatment of her "extreme pressure in rectum and pelvic floor, difficulty standing, [and] vagina much smaller since surgery," as well as dyspareunia and chronic constipation. Doc. No. 139-1 at 8 (DUF 11). Ms. Enborg's next appointment with Dr. Bowen was on January 22, 2009. Id. at 9 (DUF 13). Dr. Bowen noted that, while some of Ms. Enborg's pain had improved, her dyspareunia and constipation continued. Id. Further, Dr. Bowen noted "two small areas of granulation tissue at the top of the vagina" and recommended use of a vaginal dilator and topical estrogen. Id.

Within two weeks after Ms. Enborg began using the dilator provided by Dr. Bowen, Ms. Enborg's husband told Ms. Enborg "something like: It's not a muscle. I feel it with my finger. It's a sharp ridge." Doc. No. 139-1 at 11 (DUF 14). In a January 2013 blog post, Ms. Enborg stated, "The sharp ridge was and is a strip of effing mesh. Yeah, the kind you hear about on TV, via class-action law suits," in addition to indicating that the granulation at the top of her vagina was mesh, and not her own tissue. Id.

Dr. Bowen evaluated Ms. Enborg for continuing dyspareunia on February 20, 2009, recommending that Ms. Enborg continue to use the dilator and return "for possible trigger point injection in four weeks." Doc. No. 139-1 at 13 (DUF 15).

In her January 2013 blog post, Ms. Enborg described her February 20, 2009 visit with Dr. Bowen as follows: "So, back to the doctor I went, having felt (for myself) the stalactite by then. 'My muscles aren't sharp.' Said I. Pooh, pooh, little thing, said he. Or something like that . . . and signed me up for vaginal biofeedback to get my business to chill." Doc. No. 139-1 at 14 (DUF 16).

Ms. Enborg did not return for a follow-up appointment with Dr. Bowen until January 20,

2010, eleventh months after her February 20, 2009 appointment. Doc. No. 139-1 at 15 (DUF 17).

At the January 20, 2010 appointment, Dr. Bowen continued his evaluation of Ms. Enborg's "chronic complaints" of "pelvic floor dysfunction, dyspareunia, and constipation." Doc. No. 139-1 at 16 (DUF 18). Dr. Bowen observed that Ms. Enborg had a "[l]eft distal vaginal trigger point associated with the TVT sling," but recommended trigger point injections instead of mesh removal because he thought removal could cause recurrent incontinence. Id.

Dr. Bowen testified that, at some point between December 9, 2008 (Ms. Enborg's first visit with Dr. Bowen) and January 20, 2010 (Ms. Enborg's final visit with Dr. Bowen), he "discussed removing a portion of [the mesh] with [Ms. Enborg]." Doc. No. 139-1 at 17 (DUF 19). No portion of the mesh, however, was removed, and Ms. Enborg contends that Dr. Bowen told her the mesh was not causing her pain. Id.

From April 13, 2010 to June 22, 2012, Ms. Enborg saw Kim Duran, PA, for pelvic floor physical therapy/functional electrical stimulation ("PFP/FES"). Doc. No. 139-1 at 19 (DUF 21). At a June 22, 2010 PFP/FES session, as. Duran noted, "There is an area in the vagina where the mesh is just under the vaginal skin that is very painful," and recommended that Ms. Enborg follow up with Dr. Bowen. Id. at 19 (DUF 22).

Ms. Enborg did not have another PFP/FES session with Ms. Duran until November 30, 2011 and did not go to see Dr. Bowen in the meantime. Doc. No. 139-1 at 20 (DUF 23).

On November 30, 2011, Ms. Enborg told Ms. Duran that she noticed mesh to the left side of the vagina "poking through" and that she was "not sexually active due to pain in the vagina." Doc. No. 139-1 at 21 (DUF 24). Ms. Duran instructed Ms. Enborg to follow up with Dr. Bowen but Ms. Enborg did not do so. Doc. No. 139-1 at 23 (DUF 25). In blog posts. Ms. Enborg stated that she "put off trying to see yet another gyno for over a year" due to "denial" and "caretaking" responsibilities, and that when she "finally did go," it took her new doctor "all of two seconds to state the obvious, 'That's mesh protruding into your vaginal canal.' " Id. at 24 (DUF 26).

This case was filed on July 13, 2013 and Ms. Enborg had mesh removal surgery on September 23, 2013. Doc. No. 139-1 at 25 (DUF 27).

//

3.    *Discussion*

Ethicon argues by analogy to three mesh cases in which it prevailed on statute of limitations arguments—*Massoudi v. Ethicon, Inc.*, 2020 WL 5793006 (C.D. Cal. Sept. 24, 2020), *Ashbrook v. Ethicon, Inc.*, 514 F. Supp. 3d 971 (E.D. Ky. 2021) and *Kennedy v. Ethicon, Inc.*, 2020 WL 4050459 (E.D. Pa. July 20, 2020), *appeal dismissed*, 2021 WL 613415 (3d Cir. Feb. 3, 2021)—that the foregoing facts show that Ms. Enborg was, at a minimum, on notice of the connection between her TVT and the conditions at issue in this case by June 2010 and that consequently all of Ms. Enborg's claims (and Mr. Enborg's derivative claim for loss of consortium) are barred by the applicable two-year statute of limitations.

In *Massoudi,* however, the plaintiff testified that her gynecologist told her "the problem is from the mesh" nearly six years before plaintiff filed her product liability suit. Massoudi, 2020 WL 5793006 at *3. In *Ashbrook*, similarly, the court found the statute of limitations was triggered where plaintiff's gynecologist caused plaintiff pain by palpating her mesh and thus referred her to a urologist for consultation regarding possible removal of the mesh. 514 F. Supp. 3d at 976. Plaintiff discussed mesh removal at her first appointment with her urologist and underwent surgery in which part of the mesh removed shortly thereafter. Id. And in *Kennedy*, the court found plaintiff was on notice of potential claims where her urologist: concluded, based on a physical examination, that her bladder stone was "most likely the result of mesh erosion"; removed portions of the mesh through cystoscopy, and recommended additional removal through endoscopic excision. 2020 WL 4050459 at *3.

Further, the Court takes note of *Cutter v. Ethicon, Inc.*, 2020 WL 109809 (E.D. Ky. Jan. 9, 2020), where the court found that plaintiff was on notice of potential mesh defects under Kentucky law where surgery was performed to remove a portion of the mesh that had come loose; a second surgery was performed to remove part of the mesh that had rolled up; plaintiff's husband felt a "sharp scrape" during intercourse; and plaintiff's doctor recommended a third surgery to remove the mesh after plaintiff again reported dyspareunia. Id. at *6.

Facts comparable to those in *Massoudi*, *Ashbrook*, *Kennedy* and *Cutter* are not present in this case. Indeed, the evidence in this case appears to show that neither of the doctors Ms. Enborg

consulted in the 16-month period from October 2008 through January 2010 recommended removing the mesh or indicated to Ms. Enborg that one or more of the symptoms she was experiencing (at least some of which apparently predated mesh implantation) could be a result of the mesh, even though Ms. Enborg reported feeling mesh in and around her vagina. Similarly, the evidence does not show that merely being able to feel mesh under vaginal tissue after a TVT implant—even as a "sharp ridge" or "stalactite"—is necessarily indicative of a problem. The Court therefore cannot find on this motion that Ms. Enborg should have suspected that her injuries were mesh-related based on feedback from her doctors, her self-examination, observations made by her former husband or any combination thereof prior to January 20, 2010. Further, it is not clear from the record now before the Court what further investigation a reasonable person in Ms. Enborg's position would have conducted based on feeling mesh (or what such an investigation would have revealed) given the evidence indicating that neither of Ms. Enborg's doctors told her (or seriously entertained the possibility) that mesh was the cause of her suffering.

Similarly, the Court cannot find that Ms. Duran's statements at (or before) the June 22, 2010 PEP/FES session put Ms. Enborg on notice since Ms. Duran did no more than identify conditions that Ms. Enborg was already aware of and that Mr. Enborg's doctors had failed to address (or link to mesh) over a period of many months. A reasonable jury could find, in light of the medical advice Ms. Enborg had previously received, that it was reasonable not to go back to her doctors in the absence of new information.

Finally, the fact that Ms. Enborg eventually noticed mesh "poking through" her vaginal tissue strikes the Court as a significant development and an obvious indication, even to a layperson in "denial," that something was amiss with the TVT. It is irrelevant to the statute of limitations analysis, however, because it apparently occurred in November 2011, which was less than two years before this action was filed.

In short, a reasonable jury could find that Ms. Enborg was not on notice of the link between mesh and her conditions prior to November 2011, and the Court, therefore, will not grant summary judgment in Ethicon's favor based on the statute of limitations.

//

1    **C.    Plaintiffs' Warnings and Misrepresentation Claims (Counts I, III and IX)**

2           There are three remaining claims arising, at least in part, from the accuracy and adequacy of

3    information Ethicon provided with respect to the TVT: Count I, Count III and Count IX.

4           Count I (Negligence) alleges that Ethicon breached its duty of care "in the manufacture,

5    design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and

6    training related to the [TVT]." Doc. No. 53-1 at 24. Count III (Strict Liability / Failure to Warn)

7    alleges that Ethicon "failed to properly and adequately warn and instruct the Plaintiffs and their

8    health care providers as to the proper candidates," "the safest and most effective methods of

9    implantation and use of the [TVT]," and "the risks and benefits of the [TVT]." Id. at 28. And

10   Count IX (Negligent Misrepresentation) alleges that Ethicon breached its duty of care "in

11   representing that the [TVT] ha[d] no serious side effects different from older generations of

12   similar products and/or procedures to Plaintiffs, Plaintiffs' physicians, and the medical and

13   healthcare community." Id. at 44.

14           *1.    Applicable Law*

15           California's learned intermediary doctrine holds that a manufacturer of prescription drugs

16   or medical devices satisfies its duty to warn when it provides adequate warnings to the prescribing

17   physician, as opposed to the patient. See Carlin v. Superior Court, 13 Cal. 4th 1104, 1116 (1996)

18   ("[I]n the case of prescription drugs, the duty to warn runs to the physician, not to the patient.");

19   Brown v. Superior Court, 44 Cal. 3d 1049, 1061 n.9 (1988) ("It is well established that a

20   manufacturer fulfills its duty to warn if it provides adequate warning to the physician."). The

21   rationale for the learned intermediary doctrine is as follows:

22           (1) The doctor is intended to be an intervening party in the full sense of the word.
             Medical ethics as well as medical practice dictate independent judgment,
23           unaffected by the manufacturer's control, on the part of the doctor. (2) Were the
             patient to be given the complete and highly technical information on the adverse
24           possibility associated with the use of the drug, he would have no way to evaluate it,
             and in his limited understanding he might actually object to the use of the drug,
25           thereby jeopardizing his life. (3) It would be virtually impossible for a
             manufacturer to comply with the duty of direct warning, as there is no sure way to
26           reach the patient.

27   Carmichael v. Reitz, 17 Cal. App. 3d 958, 989 (1971). The learned intermediary doctrine applies

28   to implanted medical devices, Bigler-Engler v. Breg, Inc., 7 Cal. App. 5th 276, 320 (2017), and it

covers failure to warn claims under both the strict liability theory and the negligence theory. Saavedra v. Eli Lily & Co., 2013 WL 6345442, *3 (C.D. Cal. Feb. 26, 2013); see also Huntman v. Danek Med. Inc., 1998 WL 663362, at *1, *5-6 (S.D. Cal. July 24, 1998) (concluding that learned intermediary doctrine applied to both strict liability and negligence, as well as fraud and warranty claims); cf. Lord v. Sigueiros, 2006 WL 1510408, at *1 (Cal. Sup. Ct. Apr. 25, 2006) (finding that negligence, strict liability, and other warnings-based claims all alleged a failure to warn).

Under the learned intermediary doctrine, a plaintiff must prove "not only that no warning was provided or that the warning was inadequate, but also that the inadequacy or absence of the warning caused the [plaintiff's] injury." Motus v. Pfizer Inc., 196 F. Supp. 2d 984, 991 (C.D. Cal. 2001), aff'd sub nom. Motus v. Pfizer Inc. (Roerig Div.), 358 F.3d 659 (9th Cir. 2004); see also Latiolais v. Merck & Co., Inc., 302 F. App'x 756, 757 (9th Cir. 2008). Consequently, "[a] product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician." Motus, 358 F.3d at 661; see also Tucker v. Wright Med. Tech., Inc., 2013 WL 1149717, at *16 (N.D. Cal. Mar. 19, 2013) ("[I]nadequacy of the warning and causation are separate elements of Plaintiffs' affirmative burden. Where the physician did not read the warnings, adequacy is irrelevant and it follows that the inclusion of adequate warnings in that information would not have affected his decision." (citations and internal quotation marks omitted)).

### 2. Parties' Arguments

Ethicon argues that Plaintiffs cannot establish that any failure to warn on its part proximately caused Ms. Enborg's injuries because her implanting physician, Dr. Walter, was fully aware of all risks associated with the TVT device and that, regardless, the record shows that additional warnings from Ethicon would not have altered the course of treatment Dr. Walter prescribed and implemented. Ms. Enborg, for her part, argues that, at the time of Ms. Enborg's procedure in October 2008, Dr. Walter underestimated the risk of chronic pain and dyspareunia from TVT implants and was not at all aware that a TVT implant could exacerbate preexisting dyspareunia. Thus, Ms. Enborg contends that additional information from Ethicon could have prevented implantation.

As an initial matter, the record does not support Ms. Enborg's contention that Dr. Walter was unaware of risks associated with pain and dyspareunia. Dr. Walter testified, for example, that he understood in October 2008 that any "surgical procedur[e] in the pelvic floor"—including a TVT implant—"could increase the risk of pelvic pain and dyspareunia in a patient with [Ms. Enborg's] history," Doc. No. 112-3 at 64 (Deposition of Andrew Walter, M.D. ("Walter Dep.") at 104:1-105:1), and that he is not aware of any TVT risks today that he was not aware of in 2008. Id. (Walter Dep. at 106:10-13).

In any event, Dr. Walter testified that he had a "global discussion" with Ms. Enborg regarding the collective risks of the multiple procedures she was undergoing (which included a hysterectomy, uterosacral ligament suspension, salpingo-oophorectomy, posterior repair and cystoscopy, in addition to the TVT sling), Doc. No. 112-3 at 48 (Walter Dep. at 43:16-19), and that, aside from the risk of erosion and urinary issues specific to TVT, he did not address the risk of each procedure individually. Id. at 59 (Walter Dep. at 86:10-20). Moreover, he testified that he informed Ms. Enborg that increased pelvic pain and a worsening of her preexisting dyspareunia were both risks of his prescribed course of treatment. Id. at 48 (Walter Dep. at 43:2-19); see also id. at 44 (Walter Dep. at 27:8-19) (Dr. Walter confirming that he was aware in October 2008 that "[c]hronic dyspareunia" and "a risk of chronic pelvic pain" were both risks of TVT); id. at 48 (Walter Dep. at 42:9-22) (Dr. Walter confirming that he informed Ms. Enborg that the combined surgical procedures could worsen the pelvic pain she was already experiencing); id. at 48 (Walter Dep. at 53:1-19) ("Q. And two of the risks that you discussed globally again were the exacerbation of her chronic pelvic pain and dyspareunia which could be permanent? A. Yes."); id. at 52 (Walter Dep. at 57:22-58:7) (confirming he "told Miss Enborg … that there was an extraordinarily high likelihood that her preexisting chronic pelvic pain and also her dyspareunia would … continue even after the[] surgeries" and that "that there was a risk that in addition to just persisting that they might actually get worse"); id. at 56 (Walter Dep. at 72:18-23) ("Q: And did you specifically warn Miss Enborg that the surgical procedures you would be performing, including the TVT sling, could lead to an exacerbation and a worsening of her dyspareunia, which could be permanent? A. I did.").

1    Moreover, Dr. Walter testified that he relied "minimally" on Ethicon for information

2  regarding TVT, Doc. No. 112-3 at 44, 58 (Walter Dep. at 24:3-6, 81:8-11), and that his assessment

3  of TVT was based on "multiple sources," including medical literature, continuing medical

4  education, discussion with surgeon colleagues, and his own clinical experience with TVT. Id. at

5  43 (Walter Dep. at 22:14-23:5). The record also shows that Dr. Walter had completed more than

6  500 TVT implants over a period of nearly 10 years before treating Ms. Enborg in 2008, id. at 42

7  (Walter Dep. at 16:1-4); that to date, he has performed "well over a thousand" TVT implants, id.

8  at 41 (Walter Dep. at 15:21-25); and that he continues to use TVT in the "vast majority" of his

9  stress urinary incontinence cases today because the "evidence supports the use." Id. at 42 (Walter

10  Dep. at 16:9-21) (Dr. Walter confirming that TVT is "highly effective" with a "low rate of

11  complication"). Finally, Dr. Walter testified that he believes he "fully informed Miss Enborg of

12  the risk associated with the TVT sling," id. at 55 (Walter Dep. at 70:22-25); that he stands by his

13  decision to recommend and use TVT in treating Ms. Enborg, id. at 56 (Walter Dep. at 73:25-74:3);

14  and that he would offer a woman with Ms. Enborg's symptoms the same "treatment plan" today.

15  Id. (Walter Dep. at 74:5-9).

16    In light of this testimony, the Court finds that a reasonable jury could not conclude that

17  additional information from Ethicon regarding risks associated with pelvic pain and dyspareunia

18  would have affected the information Dr. Walter provided to Ms. Enborg or the course of treatment

19  Dr. Walter prescribed and implemented for Ms. Enborg's stress urinary incontinence, even

20  assuming Dr. Walter was not fully apprised of such risks in October 2008. Ms. Enborg therefore

21  cannot show causation under California's learned intermediary doctrine and Ethicon is entitled to

22  summary judgment on Counts I, III and IX to the extent they are based on Ethicon's alleged

23  failure to furnish accurate and adequate information regarding the TVT. See Donalds v. Ethicon,

24  Inc., 2021 WL 6126297, at *10 (D. Md. Dec. 28, 2021) (granting summary judgment in favor of

25  Ethicon on failure to warn claims under Maryland law, which also applies the learned

26  intermediary doctrine).

27    **D.    Negligent Design Defect Claim (Count I)**

28    "A product liability case must be based on substantial evidence establishing both the defect

34

1    and causation (a substantial probability that the design defect, and not something else, caused the

2    plaintiff's injury) and where . . . the complexity of the causation issue is beyond common

3    experience, expert testimony is required to establish causation." Marmont v. Bernzomatic Corp.,

4    2018 WL 6252500, at *14 (C.D. Cal. July 31, 2018) (quoting Stephen v. Ford Motor Co., 134 Cal.

5    App. 4th 1363, 1373 (2005) (internal quotation marks omitted); Lynch v. Ethicon, Inc., 2020 WL

6    5733184, at *2 (E.D. Wash. Sept. 24, 2020) ("[W]ithout an expert opinion asserting a causal link

7    between the general design defects identified by [a general expert] and [plaintiff's] injuries, [the

8    plaintiff] has not established a genuine issue of material fact."). "Causation is generally a question

9    of fact for the jury, unless reasonable minds could not dispute the absence of causation."

10   Lombardo v. Huysentruyt, 91 Cal. App. 4th 656, 666 (2001) (citation omitted).

11       Ethicon contends that the negligent design defect claim under Count I fails because Ms.

12   Enborg's case-specific expert, Dr. Ostergard, does not link any of Ms. Enborg's conditions with a

13   defect in the TVT. Doc. No. 112 at 22:18-22. As set forth above, the Court found in deciding

14   Ethicon's motion to exclude certain of Dr. Ostergard's opinions that a reasonable jury could find

15   such a causal connection based on the differential diagnosis Dr. Ostergard conducted with respect

16   to conditions at issue in this case. The Court will therefore deny Ethicon's motion for summary

17   judgment with respect to the negligent design defect claim under Count I.

18       **E.    Loss of Consortium Claim (Count XVI)**

19       "A cause of action for loss of consortium is, by its nature, dependent on the existence of a

20   cause of action for tortious injury to a spouse." Vanhooser v. Superior Court, 206 Cal. App. 4th

21   921, 927 (2012).

22       Ethicon argues that it is entitled to summary judgment on Mr. Enborg's loss of consortium

23   claim because Mr. Enborg's loss of consortium claim is derivative of other claims and because

24   Mr. Enborg did not file an opposition to Ethicon's motion for summary judgment. Doc. No. 139 at

25   1 n.1. Ms. Enborg does not address the loss of consortium claim in her opposition to Ethicon's

26   motion to dismiss. Doc. No. 136 at 20:8-11.

27       Ethicon's argument that it is entitled to summary judgment on the loss of consortium claim

28   based merely on the fact that Mr. Enborg did not oppose its motion for summary judgment is

1  without merit because the burden is on Ethicon to make an initial showing that it is entitled to

2  summary judgment. Absent such a showing, there was no obligation on Mr. Enborg's part to

3  respond in any fashion. See Burns v. Mayer, 175 F. Supp. 2d 1259, 1270 (D. Nev. 2001) (citing

4  Mirage Resorts, Inc. v. Stirpe, 152 F. Supp. 2d 1208, 1214–15 (D. Nev. 2000) (denying summary

5  judgment even though no opposition memorandum was filed)).

6        The Court has found that Ethicon is entitled to summary judgment on Ms. Enborg's failure

7  to warn/misrepresentation claims, but that Ethicon is not entitled to summary judgment on Ms.

8  Enborg's negligent design defect claim. The Court will therefore grant Ethicon's motion for

9  summary judgment as to Count XVI to the extent Mr. Enborg's loss of consortium claim is

10  predicated on Ms. Enborg's failure to warn/misrepresentation claims, but will deny the motion to

11  the extent Mr. Enborg's loss of consortium claim is predicated on Ms. Enborg's surviving

12  negligent design defect claim.

13  **III.**    **Conclusion Regarding Ethicon's Motion for Summary Judgment**

14        Ethicon's motion for summary judgment will be granted in part and denied in part, as set

15  forth above.

16                      **ORDER**

17  Accordingly, IT IS HEREBY ORDERED that:

18  1.  Ethicon's Motion to Exclude Peggy Pence, Ph.D. (Doc. No. 103) is GRANTED in part

19       and DENIED in part as follows:

20         a.  The motion is GRANTED as to Opinions #2, #3 and #4;

21         b.  The motion is DENIED as to Opinion #1;

22  2.  Ethicon's Motion to Exclude Certain Opinions and Testimony of Scott Guelcher, Ph.D.

23       (Doc. No. 104) is GRANTED in part and DENIED in part as follows:

24         a.  The motion is GRANTED as to Dr. Guelcher's opinions and testimony

25             regarding autologous fascia lata, allograft and sutures as safer alternative

26             designs and as to Dr. Guelcher's opinions and testimony as to patient

27             complications from Ethicon's mesh or PVDF;

28         b.  The motion is otherwise DENIED as to Dr. Guelcher's opinions and testimony

1    regarding PVDF;

2         c.   The motion is DENIED as to Dr. Guelcher's opinions and testimony regarding

3              degradation;

4    3.   Ethicon's Motion to Exclude Certain Opinions and Testimony of Dr. Vladimir Iakovlev

5         (Doc. No. 105) is GRANTED in part and DENIED in part as follows:

6         a.   The motion is GRANTED as to Dr. Iakovlev's "bark theory" of degradation but

7              DENIED as to Dr. Iakovlev's other degradation opinions and testimony;

8         b.   The motion is GRANTED as to Dr. Iakovlev's opinions and testimony with

9              respect to warnings;

10   4.   Ethicon's Motion to Exclude Certain Opinions and Testimony of Bruce Rosenzweig,

11        M.D. (Doc. No. 106) is GRANTED in part and DENIED in part as follows:

12        a.   The motion is GRANTED as to opinions and testimony that the non-synthetic

13             mesh procedures identified in Dr. Rosenzweig's report are safer alternatives to

14             the TVT device;

15        b.   The motion is GRANTED as to criticism of the method used to cut the mesh in

16             Ms. Enborg's TVT device;

17        c.   The motion is GRANTED as to opinions and testimony that TVT warnings

18             were insufficient because they omitted information in the MSDS, but the

19             motion is otherwise DENIED as to opinions and testimony based on the MSDS;

20   5.   Ethicon's Motion to Strike Late Supplemental Report and to Exclude Certain Opinions

21        and Testimony of Donald R. Ostergard, M.D. (Doc. No. 111) is GRANTED in part and

22        DENIED in part as follows:

23        a.   The motion to strike Dr. Ostergard's late supplemental report is GRANTED;

24        b.   The motion to exclude is GRANTED as to general causation opinions;

25        c.   The motion to exclude is DENIED as to design defect opinions and testimony

26             that relate to Ms. Enborg's conditions;

27        d.   The motion to exclude is GRANTED as to warnings and informed consent and

28             as to the use of the term "defect" or "defective" in characterizing the mesh;

1          e.   The Court RESERVES RULING on testimony regarding potential future

2             complications from the mesh subject to a proffer outside the presence of the

3             jury at trial;

4     6.   Ethicon's Motion for Summary Judgment (Doc. No. 112) is GRANTED in part and

5       DENIED in part as follows:

6          a.   The motion is DENIED as to the negligent design defect claim under Count I

7             and as to the loss of consortium claim in Count XVI to the extent the loss of

8             consortium claim in Count XVI is based on the negligent design defect claim

9             under Count I;

10          b.   Summary judgment is GRANTED to Johnson & Johnson and Ethicon, Inc. on

11             Count III, Count IX, Count X, Count XIV, Count XVII and Count XVIII, as

12             well as on claims under Count I or Count XVI that are not based on negligent

13             design defect; and

14     7.   This order also resolves Doc. No. 40 and Doc. No. 42.

15

16 IT IS SO ORDERED.

17 Dated:   __March 15, 2022__           _____

                              SENIOR  DISTRICT  JUDGE