1

2

3

4

5                              **UNITED STATES DISTRICT COURT**

6                              **EASTERN DISTRICT OF CALIFORNIA**

7

8    TERRI ENBORG, et al.                    CASE NO.  2:20-cv-02477-AWI-BAK

9              Plaintiff,                     **ORDER ON PLAINTIFF'S MOTIONS
                                              TO EXCLUDE EXPERT OPINIONS**
10   v.                                       **AND TESTIMONY**

11   ETHICON, INC., et al.,

12             Defendants.

13                                            (Doc. Nos. 107, 108, 109 & 110)

14

15

16

17

18         Plaintiff Terri Enborg has brought motions to exclude certain opinions and testimony

19   offered by experts retained by Johnson & Johnson and Ethicon, Inc. (together, "Defendants" or

20   "Ethicon"). Doc. Nos. 107, 108, 109 and 110. The motions are fully briefed and have been deemed

21   suitable for decision without oral argument pursuant to Local Rule 230(g). For the reasons set

22   forth below the motions will be granted in part and denied in part.

23                         **PROCEDURAL BACKGROUND[1]**

24         This case began as part of MDL No. 2327, *In re Pelvic Repair Systems Products Liability*

25   *Litigation*, Case No. 2:13-cv-18734 (S.D. W. Va.), before the Honorable Joseph R. Goodwin in

26   the Southern District of West Virginia (the "MDL Court"), as one of thousands of cases involving

27   _____

28   [1] Additional background relevant to the motions at issue here is set forth in the Court's March 15, 2022 order on
     Ethicon's motions to exclude expert opinion and testimony and motion for summary judgment. See Doc. No. 153.

1   injuries patients allegedly suffered after undergoing implant procedures using pelvic mesh

2   products designed, manufactured, and sold by Johnson & Johnson subsidiaries Ethicon, Inc. and

3   Ethicon, LLC. Terri Enborg and her former spouse, Christopher Enborg, (together, "Plaintiffs")

4   filed a Short Form Complaint that incorporates the First Amended Master Complaint in MDL No.

5   2327 on July 10, 2013, setting forth claims against Johnson & Johnson, Ethicon, Inc. and Ethicon,

6   LLC in connection with a TVT device implanted by Dr. Andrew Walter in October 2008. Doc.

7   No. 1 at 2-4.

8       On October 7, 2019, the MDL Court dismissed Ethicon, LLC from this action with

9   prejudice pursuant to a joint motion brought by the parties under Rule 41(a)(1)(A)(ii) of the

10  Federal Rules of Civil Procedure, leaving Johnson & Johnson and Ethicon, Inc. as the sole

11  defendants. Doc. No. 34.

12      The case was remanded to this Court on December 15, 2020. Doc. No. 67. On May 4,

13  2021, the Court issued an order granting stipulated dismissal with prejudice of Counts II (Strict

14  Liability - Manufacturing Defect), IV (Strict Liability - Defective Product), V (Strict Liability -

15  Design Defect), VI (Common Law Fraud), VII (Fraudulent Concealment), VIII (Constructive

16  Fraud), XI (Breach of Express Warranty), XII (Breach of Implied Warranty), XIII (Violation of

17  Consumer Protection Laws), and XV (Unjust Enrichment). Doc. No. 94.

18      On March 15, 2022, the Court granted summary judgment in Ethicon's favor on Count III

19  (Strict Liability - Failure to Warn), Count IX (Negligent Misrepresentation), Count X (Negligent

20  Infliction of Emotional Distress), Count XIV (Gross Negligence), Count XVII (Punitive Damages)

21  and Count XVIII (Discovery Rule or Tolling), as well as on Count I to the extent Count I arose

22  from alleged misrepresentations or insufficient warnings. Doc. No. 153. Plaintiffs' only remaining

23  claims are a claim for negligent design defect under Count I and a derivative claim for loss of

24  consortium under Count XVI. Id. That order also addresses Ethicon's motions to exclude expert

25  opinions and testimony. Id.

26                        **LEGAL FRAMEWORK**

27      The Court has a duty to act as a "gatekeeper" for expert testimony by assessing its

28  admissibility. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 145, 147 (1999); Daubert v.

Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); Fed.R.Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.").

This inquiry is governed in part by Rule 702 of the Federal Rules of Evidence, which pertains to "Testimony by Expert Witnesses" and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. At bottom, a court must ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The proponent of the testimony has the burden of proving both relevance and reliability. Bickel v. Pfizer, Inc., 431 F. Supp. 2d, 918, 921 (N.D. Ind. 2006).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth the following, non-exhaustive factors for reviewing the reliability of an expert opinion:

(1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community.

509 U.S. at 593–94. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and "a trial court may exclude evidence when it finds that there is simply too great an analytical gap between the data and the opinion proffered." Domingo ex rel. Domingo v. T.K., 289 F.3d 600, 607 (9th Cir. 2002) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)) (internal quotation marks omitted).

1   Ms. Enborg[2] brings *Daubert* motions with respect to Dr. Steven MacLean, Doc. No. 107;

2   Dr. Bruce Kahn, Doc. No. 108; Dr. Edward Stanford, Doc. No. 109; and Mr. Thomas Ulatowski,

3   Doc. No. 110.

4   **I.      Dr. Steven MacLean**

5   Dr. MacLean is a mechanical engineer and a materials scientist, with a focus on polymer

6   science and engineering. Dr. MacLean generally opines that Prolene (which contains

7   polypropylene) is a suitable material for implanted mesh devices and that Prolene does not

8   quantifiably degrade while *in vivo*.

9   Ms. Enborg seeks to exclude as unreliable the cross-sectional schematic and calculated

10  theoretical total molecular weight of excised 5-0 Prolene sutures set forth at pages 77-78 of Dr.

11  MacLean's expert report. She also contends that Dr. MacLean's testimony regarding *in vivo*

12  degradation is precluded by testimony provided by the witness Ethicon designated to address

13  degradation under Rule 30(b)(6) of the Federal Rules of Civil Procedure.

14  **A.      Cross-Sectional Schematic and Calculated Theoretical Total Molecular**

15  **Weight of Excised Prolene Sutures**

16  The dispute here has to do with data relating to *in vivo* Prolene degradation. In broad

17  strokes, Dr. Howard Jordi contends, based on a nanothermal analysis, that the 52º C difference

18  between the melt point for pristine (non-implanted) Prolene (176º C) and the melt point for

19  explanted Prolene (124º C) shows that Prolene degrades *in vivo*. Dr. MacLean disagrees. He

20  opines that, if degradation occurred, it would result in a reduction in the molecular weight of

21  Prolene and that a dog study conducted by Ethicon over a period of several years did not show a

22  statistically significant drop in the molecular weight of explanted Prolene sutures weighed in bulk.

23  Ms. Enborg argues that Dr. MacLean's analysis is not reliable because it mixes-and-

24  matches data and applies assumptions as to the depth and distribution of cracks in the surface of

25  Prolene that are inconsistent with observations set forth in the dog study and other internal Ethicon

26  _____

27  [2] It does not appear Mr. Enborg brought motions regarding Ethicon's experts. The Court therefore refers to Ms. Enborg as the moving party, but sometimes refers to "Plaintiffs"—meaning both Ms. Enborg and Mr. Enborg—when

28  discussing claims or other aspects of the lawsuit.

1    records. Ethicon argues that combining data from more than one source is entirely proper in

2    polymer science and that much of the data used in Dr. MacLean's analysis—including key data

3    regarding molecular weight and crack depth—is gleaned from work done by Ms. Enborg's own

4    experts, including Dr. Jordi, Dr. Vladimir Iakovlev and Dr. Scott Guelcher.

5         In *McBroom v. Ethicon, Inc.*, the court found that alleged flaws in Dr. MacLean's analysis

6    did not warrant exclusion and that most appropriate place to challenge his assumptions was "at

7    trial on cross-examination [] with countervailing expert testimony." 2021 WL 2709292, at *12–15

8    (D. Ariz. July 1, 2021) (quoted source and internal quotation marks omitted). The Court agrees.

9    See In re: Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig., 2016 WL 4599208, at *3–4 (S.D.W.

10   Va. Sept. 2, 2016) ("The use of inputs from different studies does not necessarily render an

11   expert's conclusions unreliable.") Dr. MacLean has clearly identified the data set and

12   methodology he used in drawing his conclusions as to *in vivo* degradation. Ms. Enborg is free to

13   attack Dr. MacLean's process, assumptions and such at trial, but the Court will deny Ms. Enborg's

14   motion to exclude as to the cross-sectional schematic and calculated theoretical total molecular

15   weight of excised Prolene sutures at pages 77-78 of Dr. MacLean's expert report.

16        **B.     Degradation Testimony by Ethicon's Rule 30(b)(6) Designee**

17        In the MDL, Ethicon designated Dr. Thomas Barbolt as its corporate witness under Rule

18   30(b)(6) on the subject of *in vivo* Prolene degradation. Ms. Enborg construes certain portions of

19   Dr. Barbolt's testimony as admissions: (1) that Prolene degrades *in vivo*; and (2) that Ethicon was

20   aware of such *in vivo* degradation before implants took place. For example, Ms. Enborg cites this

21   excerpt from a deposition Dr. Barbolt gave on January 8, 2014:

22        Q. And that's Ethicon's position as you -- as the spokesperson for Ethicon, it's
          Ethicon's position that degradation, surface degradation, can occur, correct?
23
          A. Yes.
24
          Q. And this was known well in advance of this statement that the material is not
25        absorbed, nor is it subject to degradation, correct?

26
          A. Yes. This is from 1992.
27

28   Doc. No. 107-1 at 6:2-7.

1    Ms. Enborg contends that Dr. MacLean's testimony should be barred to the extent it

2  contradicts Dr. Barbolt's testimony. Ethicon, for its part, argues that Dr. Barbolt's testimony is

3  "consistent with Ethicon's position in this litigation, as well as Dr. MacLean's opinion that

4  Ethicon's 'Prolene material is not suffering from any quantifiable degradation while *in vivo*,' "

5  Doc. No. 113 at 5:19-21, and that Rule 30(b)(6) testimony is not binding on a corporation in the

6  sense of judicial admission.

7    In *Snapp v. United Transportation Union*, the Ninth Circuit recognized that a corporation

8  "*generally* cannot present a theory of the facts that differs from that articulated by the designated

9  Rule 30(b)(6) representative," but also stated that this "general proposition … applies only where

10  the purportedly conflicting evidence truly, and without good reason or explanation, is in conflict,

11  *i.e.*, where it cannot be deemed as clarifying or simply providing full context for the Rule 30(b)(6)

12  deposition." 889 F.3d 1088, 1103 (9th Cir. 2018) (emphasis original) (quoted source and internal

13  quotation marks omitted). Further, the Ninth Circuit stated as follows:

14      [T]he testimony of a Rule 30(b)(6) deponent does not absolutely bind the
        corporation in the sense of a judicial admission, but rather is evidence that, like any
15      other deposition testimony, can be contradicted and used for impeachment
        purposes. The Rule 30(b)(6) testimony also is not binding against the organization
16      in the sense that the testimony can be corrected, explained and supplemented, and
        the entity is not 'irrevocably' bound to what the fairly prepared and candid
17      designated deponent happens to remember during the testimony.

18  Id. at 1104 (quoting 7 Moore's Federal Practice § 30.25[3] (3d ed. 2016)) (also stating that "a Rule

19  30(b)(6) deponent's own interpretation of the facts or legal conclusions do not bind the entity");

20  see also Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc., 839 F.3d 1251, 1260 (10th Cir. 2016)

21  (the majority of courts to reach the issue treat the testimony of a Rule 30(b)(6) representative as

22  merely an evidentiary admission, and do not give the testimony conclusive effect); Keepers, Inc. v.

23  City of Milford, 807 F.3d 24, 34-35 (2d Cir. 2015) ("[The plaintiff] rightly notes that an

24  organization's deposition testimony is 'binding' in the sense that whatever its deponent says can

25  be used against the organization. But Rule 30(b)(6) testimony is not 'binding' in the sense that it

26  precludes the deponent from correcting, explaining, or supplementing its statements.").

27    In the Court's view, Dr. MacLean's opinion that "Prolene material is not suffering from

28  any quantifiable degradation while *in vivo*" is not necessarily in irreconcilable conflict with Dr.

6

1  Barbolt's testimony that "surface degradation [] can occur," in that the conflict could be resolved

2  through clarification, elaboration and context. The Court will therefore deny Ms. Enborg's motion

3  as to Dr. MacLean's testimony regarding the occurrence of *in vivo* Prolene degradation. See

4  McBroom, 2021 WL 2709292 at *12–15.

5  **II.   <u>Bruce Kahn</u>**

6         Dr. Kahn is a urogynecologist with experience in the treatment of stress urinary

7  incontinence. Ethicon has identified him as an expert to provide general causation opinions with

8  respect to the TVT. Ms. Enborg takes the position that he is not qualified as an expert and that

9  some of the opinions and testimony he offers are unreliable.

10        Ms. Enborg argues, at the threshold, that Dr. Kahn is not qualified to provide general

11  causation opinions with respect to the TVT because he has not implanted a TVT device since

12  2005. Ethicon argues that Dr. Kahn is qualified as a TVT expert because: (i) he has implanted

13  approximately 2,000 polypropylene mesh slings—including 200 TVTs—over approximately two

14  decades in practice; (ii) the mesh sling with which he has the most experience (which is

15  manufactured by Boston Scientific) is "essentially the same thing" as the TVT; and (iii) he is

16  familiar, as a seasoned urogynecologist, with medical literature and research regarding the TVT

17  and other treatments for stress urinary incontinence.

18        The Court is inclined to agree with Ms. Enborg that the fact that Dr. Kahn stopped using

19  the TVT in his practice 15 years ago—and that 90% of his experience is with a different device—

20  tends to undercut his standing as a TVT expert. Still, Dr. Kahn has implanted 200 TVTs (in

21  addition to his work with a supposedly similar device), and has a great deal of formal education,

22  continuing education and general experience relevant to evaluating the safety and efficacy of

23  TVTs. The Court therefore finds that he his qualified to provide general causation opinions and

24  testimony as to TVTs. See Fed.R.Evid. 702 (allowing experts qualified "by knowledge, skill,

25  experience, training, or education"). The Court will therefore deny the motion in this respect.

26        That said, the Court finds Dr. Kahn's opinions to be unreliable with respect to

27  biocompatibility; the degradation or fraying of the TVT; and pain, erosion and exposure, and

28  urinary problems. Such opinions cannot be reliably based solely on Dr. Kahn's limited—and

dated— clinical experience with the TVT device. It does not appear that Dr. Kahn conducted studies of his own on these issues. And it is not clear how the knowledge Dr. Kahn supposedly "gleaned from medical literature" lead him to the conclusions set forth in his report on these issues. For example, the entire discussion of degradation in Dr. Kahn's report consists of the following:

> I have not seen—nor does the high-quality published literature support— degradation of the Prolene polypropylene, shrinkage, inadequate pore size, excessive weight, chronic problematic foreign body reaction, cytotoxicity, cancer, fraying, roping, or particle loss with TVT slings. It shows that the purported microscopic degradation some have claimed to witness with polypropylene slings is actually a coating of cracked biologic material that can be removed to reveal pristine polypropylene underneath. (de Tayrac R and Letouzey V, Basic science and clinical aspects of mesh infection in pelvic floor reconstructive surgery. Int Urogynecol J 2011 Jul;22(7):775-80; Thames SF, et al., The myth: in vivo degradation of polypropylene-based meshes. Int Urogynecol J 2017 Feb;28(2):285-97.) The published studies and my own experience with polypropylene mesh mid-urethral slings including the TVT demonstrate that the material does not degrade; the slings are effective in the long-term and very well-tolerated by the body.

Doc. No. 108-3 at 21-22.

The discussion as to the other topics at issue on this motion is similarly abbreviated and conclusory. The Court will therefore grant Ms. Enborg's motion with respect to Dr. Kahn's opinions regarding biocompatibility; the degradation or fraying of the TVT; and pain, erosion and exposure, and urinary problems.

Finally, the Court has granted summary judgment in Ethicon's favor on misrepresentation and warnings claims. Dr. Kahn's opinions as to warnings in the TVT's "Instructions for Use" ("IFU") will therefore be excluded for lack of relevance. See Fed.R.Civ. 402.

## III.   **Edward Stanford**

Dr. Edward Stanford is a board-certified obstetrician and gynecologist who has implanted more than 2,000 patients since 1999 with transvaginal synthetic mesh for the surgical treatment of stress urinary incontinence. Ms. Enborg seeks to exclude Dr. Stanford's opinions and testimony regarding: (1) the adequacy of Ethicon's product warnings and the TVT IFU (including knowledge of mesh risks among doctors); (2) the safety, efficacy and satisfaction rates of the mesh products observed in his practice; and (3) whether polypropylene mesh degrades inside the human

body

### A.      Product Warnings, the TVT IFU and Awareness of Risks Among Doctors

Ms. Enborg argues that Dr. Stanford's opinions and testimony as to the adequacy of
Ethicon's warnings for the TVT device are unreliable because they are based on his "personal
convictions" and not "on any industry standards or regulations governing the adequacy of
warnings." Doc. No. 109-1 at 3:16-19. Further, Ms. Enborg argues that Dr. Stanford should not be
permitted to guess as to the "knowledge and state of mind" of doctors considering mesh to treat
stress urinary incontinence. Doc. No. 109-1 at 3:20-22.

As noted above, the Court has granted summary judgment in Ethicon's favor on Plaintiffs'
warnings and misrepresentation claims. Dr. Stanford's testimony regarding the adequacy of
Ethicon's warnings and the knowledge of doctors as to mesh risks will therefore be excluded for
lack of relevance. Fed.R.Evid. 402.

### B.      TVT Safety, Efficacy and Satisfaction Rates

Ms. Enborg argues that Dr. Stanford should be precluded from testifying regarding his
perceptions as to the safety of products used in his practice, the efficacy of products used in his
practice, and patient satisfaction rates for products used in his practice because he has been in
"administrative retirement" since 2015, his perceptions are not based on reliable methodology and
his findings have not been peer-reviewed or published.

As the *McBroom* court noted,  however, not all expert testimony will "rely on anything like
a scientific method" or be "objectively verifiable[.]" 2021 WL 2709292 at *15–*17 (quoting
Fed.R.Evid. 702, advisory committee's note to 2000 amendment). And peer-review and
publication requirements "are not applicable to...testimony[ ] whose reliability depends heavily on
the knowledge and experience of the expert, rather than the methodology or theory behind it."
United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000).

Ms. Enborg may cross-examine Dr. Stanford as to the amount of time that has passed since
he stopped treating patients, the methods (if any) he used to collect and preserve clinical data and
other factors going to the reliability of his observations, but Ms. Enborg's motion will be denied as
to opinions and testimony regarding safety, efficacy and satisfaction rates.

1

## C.    Mesh Degradation

2      Ms. Enborg contends that Dr. Stanford should be barred from testifying about mesh

3 degradation because he ignores certain literature confirming mesh degradation; places undue

4 weight on a biased article denying the existence of mesh degradation; and did not review Ethicon

5 records evidencing mesh degradation. Further, Ms. Enborg contends that Dr. Stanford draws a

6 "strange" analogy between degraded mesh and a rusty steel beam that is not based on reliable

7 methodology or appropriate for an expert report.

8      These criticisms go to the weight, not admissibility, of Dr. Stanford's opinion regarding

9 mesh degradation. The record shows that Dr. Stanford has conducted "several hundred" TVT

10 implants and Ms. Enborg does not contend that Dr. Stanford is not qualified to offer opinions and

11 testimony regarding the TVT based on his clinical experience. In the Court's view, Dr. Stanford's

12 clinical experience coupled with the literature review he purports to have conducted provide a

13 reliable basis for the opinions he offers regarding mesh degradation. See Carlson v. Bos. Sci.

14 Corp., 2015 WL 1931311, at *12 (S.D. W. Va. Apr. 28, 2015) (admitting expert opinion regarding

15 polypropylene degradation based an analysis of scientific articles combined with relevant clinical

16 experience). Ms. Enborg may cross-examine Dr. Stanford regarding his clinical experience, as

17 well as the scope and nature of his literature review, but her motion to exclude will be denied as to

18 Dr. Stanford's opinion that, from his own clinical experience and research, TVT mesh does not

19 significantly degrade *in vivo*. See McBroom, 2021 WL 2709292 at *16–*17 (denying motion to

20 exclude Dr. Stanford's testimony regarding the TVT and mesh degradation).

21 **IV.    Mr. Timothy Ulatowski**

22      Mr. Ulatowski worked for the FDA for more than 15 years. Ethicon has retained him as a

23 regulatory expert. Ms. Enborg's motion with respect to Mr. Ulatowski raises three main issues: (1)

24 whether to allow Mr. Ulatowski's opinions and testimony regarding the FDA's 510(k) clearance

25 process; (2) whether to allow Mr. Ulatowski's opinions and testimony regarding other FDA

26 subject matter; and (3) whether to allow Mr. Ulatowski's opinions and testimony with respect to

27 product information and manufacturing. See Doc. No. 110. In addition, Ms. Enborg argues that

28 Mr. Ulatowski's expertise is limited to regulatory matters and that specific opinions in Mr.

10

1  Ulatowski's report should be excluded. Id.

2      **A.**    **FDA's 510(k) Clearance Process**

3        The FDA's 510(k) clearance process lets manufacturers attempting to market a new

4  medical device avoid the FDA's premarket approval review where the device is " 'substantially

5  equivalent' to either a pre-1976 device that the FDA hasn't yet classified or a Class I or II device

6  already on the market." Kaiser v. Johnson & Johnson, 947 F.3d 996, 1004 (7th Cir. 2020) (quoting

7  21 U.S.C. § 360c(f)(1)); see also Huskey v. Ethicon, Inc., 848 F.3d 151, 160–61 (4th Cir. 2017)

8  (discussing the 510(k) clearance process). The premarket approval process that the 510(k)

9  clearance process circumvents, by contrast, "requires extensive submissions by the device

10  manufacturer and a thorough review by the FDA." Kaiser, 947 F.3d at 1003.

11        In its Wave 1 Order, the MDL Court excluded evidence relating to the FDA's 510(k)

12  clearance process on findings that the 510(k) clearance process goes only to equivalency with

13  products already on the market and "does not go to whether [a] product is safe and effective"; and

14  that the "negligible probative value" of such evidence was substantially outweighed by the risk of

15  misleading the jury and wasting time. In re: Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.,

16  2016 WL 4493646, at *3 (S.D. W.Va. Aug. 25, 2016) ("Delving into complex and lengthy

17  testimony about regulatory compliance could inflate the perceived importance of compliance and

18  lead jurors to erroneously conclude that regulatory compliance proved safety." (internal

19  punctuation and citation omitted)).

20        Ethicon argues that this Court should exercise its inherent authority to disagree with the

21  MDL Court on this issue because the MDL Court's reliance on *Lohr v. Medtronic, Inc.*, 518 U.S.

22  470 (1996) was misplaced. *Lohr* involved 510(k) clearance based on comparison to unclassified,

23  pre-1976 devices. 518 U.S. at 493. The 510(k) clearance for the TVT, by contrast, was based on

24  comparison to post-1976 devices that were placed in Class II on findings that "special controls"

25  could "provide adequate assurance of safety and effectiveness." See Doc. No. 116 at 4:3-41; see

26  also 21 U.S.C. § 360c(a) (1)(B). The salient distinction, Ethicon contends, is that the unclassified,

27  pre-1976 comparators in *Lohr* had not undergone any safety review, whereas the Class II, post-

28  1976 comparators used in securing 510(k) clearance for the TVT had undergone safety screening.

Ethicon has raised and lost this argument in numerous other courts. See, e.g., Willams v. Ethicon, Inc., 2021 WL 1087808, at *4 (M.D. Ga. Mar. 22, 2021) (finding that 510(k) clearance says little about product safety; that Mr. Ulatowski's report says "nothing of consequence" about safety analysis in the 510(k) process; and that delving into the 510(k) process would entail not a "mini-trial" but a "maxi-trial"); In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prods. Liab. Litig., 2020 WL 9887565, at *5 (N.D. Ga. Nov. 25, 2020) (acknowledging that *Lohr* is "not entirely on all fours" but finding that "510(k) clearance is not evidence that Defendants satisfied any standard of care in designing [the device at issue]"); Salinero v. Johnson & Johnson, 2019 WL 7753438, at *4–6 (S.D. Fla. Sept. 25, 2019) (finding that a jury could "give undue weight to the FDA's equivalence finding" and mistake 510(k) clearance for a "rigorous safety review").

In *Foster v. Ethicon, Inc*., for example, the court found that "even accepting Ethicon's proposition that the 510(k) process had a 'safety component' " when using Class II, post-1976 devices (as opposed to unclassified, pre-1976 devices) as comparators, "the 510(k) safety and effectiveness equivalence pathway to approval still 'does little to inform as to its safety.' " 2021 WL 4476642, at *4–7 (D. S.D. Sept. 30, 2021) (quoting Williams, 2021 WL 1087808 at *4). And in *Heinrich v. Ethicon, Inc.*, similarly, the court found that 510(k) clearance says little about the safety of a cleared product because 510(k) "does not amount to a safety regulation requiring device producers to meet any established design standards." 2021 WL 2801965, at *2–7 (D. Nev. June 15, 2021).

Reviewing the record in this case against relevant statutory provisions and case law, the Court agrees with the courts, such as those cited above, that have found that "510(k) clearance is remote from FDA safety review," Kaiser, 947 F.3d at 1018; that Mr. Ulatowski's report does little to address the safety-related aspects of 510(k) clearance as applied to the TVT; and that evidence relating to 510(k) would create significant risk of confusing the jury, misleading the jury and wasting time.

In addition to arguing that the 510(k) clearance process constitutes a safety review when Class II, post-1976 devices are used as comparators, Ethicon argues that "[u]nder California law, [] evidence of compliance with a governmental standard is relevant to the defense of a production

1  liability claim"; that it "***must*** be able to prove that it complied with all relevant FDA regulations in

2  clearing TVT"; and 510(k) compliance is directly relevant to demonstrating that Ethicon is not

3  liable for punitive damages. Doc. No. 116 at 7:15-8:22 (emphasis original).

4        These arguments, however, ignore the fact that courts have found (again and again) that

5  510(k) clearance "does not amount to a safety regulation requiring device producers to meet any

6  established design standards." Heinrich, 2021 WL 2801965 at *2–7. In one of the cases cited by

7  Ethicon in its California law arguments, the court found that the defendant was entitled to

8  introduce evidence regarding "compliance with [] minimum statutory requirements and

9  generalized safety standards," Scantlin v. Gen. Elec. Co., 2011 WL 13130835, at *2 (C.D. Cal.

10 Apr. 8, 2011), on reconsideration in part, 2014 WL 12586381 (C.D. Cal. Aug. 18, 2014); and in

11 another, the court found that "evidence of industry safety standards is relevant in a product

12 liability action." Binning v. Louisville Ladder, Inc., 2014 WL 4249667, at *5 (E.D. Cal. Aug. 27,

13 2014). Such findings have no applicability where, as here, the government regulation in question

14 does not establish or embody "safety standards."

15       The Court will therefore exclude opinion and testimony regarding the 510(k) clearance

16 process, subject to the caveat that Plaintiffs do not seek to show that Ethicon failed to comply with

17 regulations pertaining to premarket review.

18       **B.    Other FDA Matters**

19       Ms. Enborg states, in one breath, that she "is not, through this motion, moving for

20 exclusion of all FDA evidence from her case," but in the next, that she assumes this Court will

21 adopt a ruling by the MDL Court excluding "all opinions that touch on FDA or other regulatory

22 matters" (at least to the extent they are offered by Mr. Ulatowski). Doc. No. 110-1 at 3:20-4:4;

23 5:14-17. Ethicon, for its part, argues that it should be permitted to introduce "highly probative

24 FDA-related evidence that does not hinge on 510(k) clearance and classification," such as Mr.

25 Ulatowski's opinions regarding "the 1988 classification of all surgical mesh" and "the 2011

26 medical panel review of surgical mesh." Doc. No. 116 at 9:2-13.

27       The Court is sensitive to the Rule 403 risks posed by FDA-related evidence and is

28 generally in agreement with findings by other courts that such evidence should be kept to a

1   minimum (if not avoided altogether). <u>See</u> <u>Bellew v. Ethicon, Inc.</u>, 2014 WL 6680356, at *10 (S.D.

2   W.Va. Nov. 25, 2014) (MDL Court barring Mr. Ulatowski from providing expert testimony

3   regarding not only the 510(k) clearance process, but also "FDA regulations, other FDA

4   procedures, FDA communications, and Ethicon's compliance with FDA law" on the grounds that

5   any probative value was outweighed by the risk of undue prejudice, jury confusion and waste of

6   time); <u>Sanchez v. Boston Scientific Corp.</u>, 2014 WL 4851989, at *35–36 (S.D. W.Va. Sept. 29,

7   2014) ("Given that the probative value of expert testimony on FDA requirements is substantially

8   outweighed by the risk of jury confusion, I cannot admit Dr. Pence's testimony as it relates to the

9   FDCA or FDA regulations."). The Court, however, is reluctant to issue a blanket ruling on

10  opinions and testimony relating to FDA matters based solely the papers now before it and without

11  first seeing the motion *in limine* Ms. Enborg apparently plans to bring with respect to FDA

12  evidence.

13      The Court will therefore reserve ruling on this portion of Ms. Enborg's motion, except to

14  the extent that the Court addresses overlapping issues below in connection with Mr. Ulatowski's

15  specific opinions.

16          **C.      Manufacturing, Product Warnings and Product Brochures.**

17      Ms. Enborg argues that Mr. Ulatowski is strictly a regulatory expert and is therefore

18  unqualified to offer opinions and testimony with respect to manufacturing, warnings in the IFU,

19  and patient brochures.

20      Ms. Enborg's manufacturing defect claim was dismissed with prejudice by stipulation of

21  the parties, Doc. No. 94, and the Court has granted summary judgment in Ethicon's favor on Ms.

22  Enborg's warnings and misrepresentation claims. Doc. No. 153. Mr. Ulatowski's opinions and

23  testimony as to manufacturing, product warnings and product brochures will therefore be excluded

24  for lack of relevance. <u>See</u> Fed.R.Evid. 402.

25      The Court will now address specific opinions set forth in Mr. Ulatowski's TVT report.

26          **D.      Specific Opinions**

27      Ms. Enborg seeks to exclude a number of Mr. Ulatowski's specific opinions. Her motion

28  (which appears to be recycled from other cases) addresses opinions set forth in the report Mr.

1   Ulatowski prepared for the TVT-O. This order, however, will address the largely parallel opinions

2   set forth in the report Mr. Ulatowski prepared for the TVT, which is the device at issue in this

3   case. <u>See</u> Doc. No. 110-4.

4

5   **<u>Opinion # 1</u>**: **"It is my opinion that the recall of the Microvasive ProteGen Sling, one of the**

6   **predicates for the TVT Classic, had no regulatory or safety impact whatsoever on the**

    **continued marketing of the TVT Classic. It was appropriate and consistent with industry**

7   **standards for Ethicon to use ProteGen as a predicate."** Doc. No. 110-4 at 50.

8       Ethicon states that it does not intend to introduce evidence regarding the decision to stop

9   selling ProteGen unless Plaintiffs introduce evidence of the ProteGen recall over Ethicon's

10  objections. It appears from Ms. Enborg's reply that Ms. Enborg does not intend to introduce

11  evidence of the ProteGen recall. The Court will therefore deny the motion as moot with respect to

12  this opinion.

13

14  **Opinion #2:** **"It is my opinion that the primary material used in the Ethicon TVT device,**

    **Prolene, is safe and effective from a regulatory perspective; long-term safe and effective**

15  **performance of the material supports its continued regulatory acceptance as an implantable**

16  **material. It is also consistent with industry standards and practices for Ethicon to use**

    **Prolene as the material for surgical mesh."** Doc. No. 110-4 at 52.

17

18      Ms. Enborg argues that this opinion is a "back-door attempt to show FDA approval" for

19  the TVT device. Doc. No. 110-1 at 6:17. She claims it would require her to explain that FDA

20  approval of Prolene does not mean all devices containing Prolene have been approved, which

21  would then lead to a discussion of whether the TVT itself was approved and, thus, the 510(k)

22  clearance process.

23      Ethicon argues that this opinion is relevant to address contentions that Prolene filaments

24  become unsafe when made into mesh. Further, Ethicon argues that this testimony does not

25  implicate the 510(k) clearance process because "it involves events that took place decades before

26  TVT's 510(k) was submitted" and "has to do with the approval of suture and classification of

27  surgical mesh made of the same filaments as suture, not 510(k) clearance of a device." Doc. No.

28  116 at 10:17-21.

1    In *Lewis v. Johnson & Johnson*, the MDL Court found that "analyzing the component parts

2    of a device separately from the device itself simply does not make sense," 991 F. Supp. 2d 748,

3    and in *Foster v. Ethicon*, the court found that "[a]llowing Ulatowski to opine that the FDA

4    approved the Prolene suture raises the same Rule 403 problems as the section 510(k) process." See

5    Foster, 2021 WL 4476642 at *6; see also Heinrich, 2021 WL 2801965 at *3 ("This Court

6    concludes that '[a]llowing Ulatowski to opine that the FDA approved the Prolene suture raises the

7    same Rule 403 problems as the section 510(k) process.' ").

8    The Court is not convinced, however, that Rule 403 problems outweigh the probative value

9    of this testimony. To the extent Ms. Enborg seeks to show that using Prolene in the TVT was

10   negligent, it seems to the Court that Ethicon could be entitled to show why using Prolene was

11   consistent with its duty of care. The gravamen of court orders (including this order) barring 510(k)

12   evidence is that 510(k) clearance says little about safety and that consequently Rule 403 risks

13   cannot be justified. Mr.Ulatowski's opinion on the safety of Prolene, however, appears to be based

14   on the fact that the FDA approved a New Drug Application (NDA) for Ethicon's Prolene suture in

15   1969. Doc. No. 110-4 at 53. Further, he states that "[t]he original basis for approval was extensive

16   chemistry, preclinical and clinical information." Id. at 53 & 56 (n.132). His opinion thus purports

17   to be based on a review process that is different from—and meaningfully more rigorous than—

18   mere 510(k) clearance.

19   In the Court's view, such information could, on balance, be helpful to a jury in deciding

20   Ms. Enborg's negligent design defect claim. Further, the Court is not convinced at this juncture

21   that testimony regarding Prolene approval would necessitate a lengthy examination of 510 (k)

22   clearance or otherwise trigger unmanageable Rule 403 problems. The Court will therefore reserve

23   ruling on this aspect of Ms. Enborg's motion until more information becomes available at trial.

24

25   **Opinion # 3: " It is my opinion that a change in material or PROLENE weave specifications
     for the TVT Classic would require the submission of a new 510(k) to FDA and clearance by**

26   **FDA before the modified device could be marketed."** Doc. No. 110-4 at 54.

27

28

16

1    Ms. Enborg argues that this opinion should be excluded because it implicates the 510(k)

2  clearance process. Ethicon argues that this opinion is relevant to safer alternative design analysis

3  because a design is not, as a matter of law, "available" if it requires FDA clearance but has not

4  been cleared. Further, Ethicon argues it is relevant to show that Ms. Enborg's design defect claim

5  is barred by impossibility or conflict preemption.

6    The MDL Court rejected this line of argument, see Mullins v. Ethicon, 2015 WL 7761033,

7  at *3 ("Congress, the Supreme Court, and common sense counsel against such a result."), and

8  Ethicon has failed to set forth authority showing that it has merit under California law. Further, the

9  opinion plainly implicates the Rule 403 problems associated with opinions and testimony

10  regarding 510(k).

11    Ms. Enborg's motion will therefore be granted as to Opinion #3. See Heinrich, 2021 WL

12  2801965, at *4 (excluding Mr. Ulatowski's opinion that a change by Ethicon in the material for the

13  TVT-S would have required clearance by the FDA despite Ethicon's argument that an alternative

14  design is not available if it would have required clearance by the FDA); Bell v. Ethicon, Inc., 2021

15  WL 1111071, at *7 (S.D. Tex. Mar. 23, 2021) (rejecting Ethicon's argument that a "lack of FDA

16  approval precludes an alternative design" where Ethicon did not cite any Texas authority

17  validating its argument).

18

19  **Opinion # 4: "It is my opinion that there was no reason for FDA to recommend labeling changes to the TVT Classic. FDA requested changes to TVT Classic labeling before
20  clearance in 1998."** Doc. No. 110-4 at 55.

21

22    Ms. Enborg argues that this opinion "strongly suggests" that the FDA approved the TVT,

23  thus necessitating exploration of the 510(k) clearance process. Further Ms. Enborg argues that it

24  would necessitate an unwieldy examination of the FDA's labeling process and that Mr. Ulatowski

25  is unqualified to offer opinions on labeling because he is not a warnings expert. Ethicon argues

26  that the fact that no changes were required to TVT labeling "after its comprehensive 2011 review"

27  shows the "safety and effectiveness" of the TVT.

28    The Court has excluded opinions and testimony regarding the 510(k) clearance process on

the grounds that it is not probative of TVT safety and that whatever probative value it may have is outweighed by Rule 403 problems. Ethicon has failed to show that FDA labeling protocols are more probative of safety—or less problematic from a Rule 403 standpoint—than the 510(k) clearance process. Further, the Court has granted summary judgment in Ethicon's favor on Ms. Enborg's warnings and misrepresentation claims. Ms. Enborg's motion to exclude will therefore be granted as to Opinion #4. See Heinrich, 2021 WL 2801965, at *4.

**Opinion # 5: "It is my opinion the FDA October 2008 Public Health Notice and subsequent updated FDA web information for health care workers and patients on treatment of SUI support Ethicon's position that the patient brochures were intended as only part of the interaction between the physician and patient regarding the potential treatment options for SUI and the warnings, precautions, and adverse effects for each option. This usage of patient brochures is consistent with industry practices and standards."** Doc. No. 110-4 at 57.

The Court has granted summary judgment in Ethicon's favor on Ms. Enborg's warnings and misrepresentation claims. This opinion will therefore be excluded for lack of relevance.

**Opinion # 6: "It is my opinion there is no regulatory requirement concerning the content or format of prescription medical device patient brochures. The TVT brochures are not false or misleading. There is no requirement for 'fair balance' in device labeling."** Doc. No. 110-4 at 58.

The Court has granted summary judgment in Ethicon's favor on Ms. Enborg's warnings and misrepresentation claims. This opinion will therefore be excluded for lack of relevance.

**Opinion #7: "It is my opinion that the FDA recall and Warning Letter databases do not document common or unusual TVT device manufacturing problems."** Doc. No. 110-4 at 61.

Ms. Enborg's manufacturing defect claim has been dismissed with prejudice by stipulation of the parties. This opinion will be dismissed for lack of relevance.

**Opinion # 8: "In regard to the design and manufacturing of the Gynecare TVT device,**

**Ethicon was proactive in striving to ensure that its complaint and medical device reporting procedures, training of staff on those procedures, implementation, and documentation were substantially compliant with regulations. FDA regulations permit manufacturers to determine whether or not a complaint is a reportable event based on causation. Ethicon's procedures were consistent with industry standards and practices."** Doc. No. 110-4 at 61.

Ethicon states that it will only seek to introduce this opinion if Plaintiffs are allowed to put on evidence regarding medical device reports ("MDRs"). Ms. Enborg indicates that Plaintiffs do not intend to present such evidence. Ms.Enborg's motion will therefore be denied as moot as to Opinion #8.

**Opinion #10:[3] "In regard to the design, manufacturing, testing and marketing of the Gynecare TVT Classic Ethicon substantially complied with all FDA premarket and related quality system requirements prior to and during marketing for the TVT Classic including, for example, 510(k) and design control requirements. Ethicon's launch and continued clinical use of the TVT Classic was supported by clinical assessments of benefit vs risk."** Doc. No. 110-4 at 64.

Ethicon states that it will only seek to introduce this opinion if Plaintiffs are allowed to argue that Ethicon failed to conduct proper testing before marketing the TVT or otherwise did not comply with FDA 510(k) requirements. Ms. Enborg states that Plaintiffs intend to set forth evidence through Dr. Peggy Pence that Ethicon's premarket testing was "inadequate," but that Plaintiffs have "no plans to make assertions about which 510(k) requirements were not met." Doc. No. 122 at 5:12-14.

The Court has denied Ethicon's motion to exclude Dr. Pence's opinions as to the adequacy of premarket testing. See Doc. No. 153 at 5-6. That ruling, however, was based on a finding that Dr. Pence's premarket testing opinion was based on industry standards. Id. The Court is not sure how to construe Ms. Enborg's statement that Plaintiffs have "no plans to make assertions about which 510(k) requirements were not met," but it strikes the Court as something less than a full-throated renunciation of regulatory evidence as to the adequacy of premarket testing. The Court will therefore offer this clarification: To the extent Plaintiffs seek to show—directly or indirectly,

---

[3] The Court does not see an opinion #9 in Mr. Ulatowski's TVT report.
.

through Dr. Pence's testimony or otherwise—that Ethicon failed to satisfy regulatory requirements with respect to premarket testing for the TVT, the Court will revisit its order excluding opinions and testimony regarding the 510(k) clearance process and consider allowing Opinion #10 (or something similar) for purposes of rebuttal.

Subject to that caveat, the Court will grant the motion as to Opinion #10, based on its ruling excluding opinions and testimony regarding the 510(k) clearance process.

**Opinion #11: "In regard to the design, manufacturing, labeling and marketing of the Gynecare TVT device, the Issue Reports and the associated Medwatch reports are indicative of Ethicon's substantial compliance with complaint and MDR regulatory requirements as well as consistency with industry standards and practices."** Doc. No. 110-4 at 67.

Ethicon states that it will not introduce this opinion if the Court excludes Plaintiffs' expert's opinions that Ethicon did not comply with applicable regulations. Ms. Enborg states that Plaintiffs do not intend to raise this issue at trial. The motion will therefore be denied as moot as to Opinion #11.

**Opinion #12: "In regard to the design and testing of the Gynecare TVT device, the clinical evidence supporting the safety and effectiveness of Ethicon TVT devices were of a sample size and duration consistent with clinical evidence in other 510(k) devices and even with several PMA approved devices."** Doc. No. 110-4 at 68.

Ethicon states that it will not seek to introduce this opinion at trial if the Court excludes Plaintiffs' expert's opinions that it did not comply with applicable regulations. Ms. Enborg indicates that Plaintiffs do not intend to raise compliance with the regulations at issue here at trial. The Court will therefore deny the motion as to Opinion #12 as moot.

**Opinion #13 – "In regard to the design and testing of the Gynecare TVT device, the FDA's evaluation of substantial equivalence in a 510(k) includes an analysis of the safety and effectiveness of the device."** Doc. No. 110-4 at 69.

This opinion will be excluded for the reasons set forth above in the Court's discussion of the 510(k) clearance process.

1   **Opinion #14: "It is my opinion that the labeling for the TVT Classic is substantially compliant with regulatory requirements and industry standards and practices."** Doc. No. 110-4 at 71.

2

3       The Court has granted summary judgment in Ethicon's favor on Ms. Enborg's warnings

4   and misrepresentation claims. This opinion with therefore be excluded for lack of relevance.

5

6   **Opinion #16:[4] "It is my opinion that the adverse press and litigious environment after the 2011 FDA Safety Notice resulted in an atypical surge of MDR reports."** Doc. No. 110-4 at 73.

7

8       Ethicon has stated that it will not seek to introduce this opinion if Plaintiffs do not

9   introduce evidence regarding MDR reports at trial. Ms. Enborg indicates that she does not intend

10  to introduce evidence regarding MDR reports at trial, so the motion will be denied as moot with

11  respect to Opinion #16.

12                          **CONCLUSION**

13      For the foregoing reasons, Ms. Enborg's motions to exclude will be granted in part and

14  denied in part as set forth above.

15                            **ORDER**

16      Accordingly, IT IS HEREBY ORDERED that:

17  1.  Ms. Enborg's Motion to Exclude the TVT General Causation Opinions and Testimony

18      of Steven MacLean, Ph.D., P.E. (Doc. No. 107) is DENIED;

19  2.  Ms. Enborg's Motion to Exclude the TVT General Causation Opinions and Testimony

20      of Bruce S. Kahn (Doc. No. 108) is GRANTED in part and DENIED in part as set

21      forth above;

22  3.  Ms. Enborg's Motion to Exclude the TVT General Causation Opinions and Testimony

23      of Edward Stanford, M.D. (Doc. No. 109) is GRANTED in part and DENIED in part

24      as set forth above;

25  //

26  //

27

28  ---
    [4] The Court does not see an opinion #15 in the TVT Report.

                              21

4. Ms. Enborg's Motion to Exclude the TVT General Causation Opinions and Testimony of Timothy Ulatowski (Doc. No. 110) is GRANTED in part and DENIED in part as set forth above.

IT IS SO ORDERED.

Dated:   March 21, 2022

_____

SENIOR  DISTRICT  JUDGE